[No. C058479. Third Dist. June 30, 2009.]

JOSH SHAW et al., Plaintiffs and Appellants, v.
THE PEOPLE ex rel. JOHN CHIANG, as Controller, etc., et al., Defendants
and Appellants.

578

582

584

**COUNSEL**

Nielsen, Merksamer, Parrinello, Mueller & Naylor, Richard D. Martland, Kurt Oneto, James R. Parrinello and Chris Skinnell for Plaintiffs and Appellants.

Richard A. Marcantonio and Guillermo Mayer for Transform, California Public Interest Research Group, Urban Habitat, Planning and Conservation League, California Rural Legal Assistance, Inc., Legal Services of Northern California and Los Angeles Bus Riders Union as Amici Curiae on behalf of Plaintiffs and Appellants.

Edmund G. Brown, Jr., Attorney General, Christopher E. Krueger, Assistant Attorney General, Constance L. Lelouis and Daniel J. Powell, Deputy Attorneys General, for Defendants and Appellants.

**OPINION**

**CANTIL-SAKAUYE, J.**—This case considers the effect on the state budgetary process of a bond initiative measure (Proposition 116) almost two decades after it was approved by voters. Specifically, we consider the legality of the Legislature's creation of the Mass Transportation Fund, the legality of the Legislature's transfer of a portion of spillover gas tax revenue to the Mass Transportation Fund and the Legislature's appropriation of $1.2 billion[1] from the Mass Transportation Fund and the Public Transportation Account for the 2007–2008 budget year in light of Proposition 116.

---

[1] The appropriations and transfers are at issue—not the exact amounts. Thus, the appropriations and transfers in the opinion (except for our conclusion summary) are rounded approximations.

Josh Shaw, an individual California taxpayer and elector, and the California Transit Association, a nonprofit corporation (hereafter petitioners), filed a petition for writ of mandamus, declaratory and injunctive relief against John Chiang, the California State Controller, and Michael C. Genest, California Director of Finance (hereafter the State), challenging the Legislature's actions. The trial court generally upheld the challenged actions, rejecting only the Legislature's transfer of $409 million from the Public Transportation Account to the General Fund for past debt service payments on Proposition 108 bonds as not being consistent with the purposes of the Public Transportation Account as described by Proposition 116. Petitioners appeal from the trial court's rejection of their other claims.[2] The State cross-appeals the trial court's judgment regarding the $409 million transfer.

We agree with petitioners that the trial court improperly upheld the challenged legislative actions. Rejecting the position of the State in its cross-appeal, we also conclude the trial court properly invalidated the $409 million transfer. We shall reverse in part and affirm in part.

## BACKGROUND

An understanding of the Retail Sales Tax Fund and certain transfers from such fund, Proposition 116, Proposition 2, Proposition 42 and Proposition 1A is essential to this opinion. These statutes and propositions are discussed at length where pertinent to the appeal, but we begin with a short overview.

California uses state retail sales and use tax revenues to fund the general operation of state government. With a few exceptions not relevant here (Rev. & Tax. Code, §§ 7101, 7101.3), state retail sales and use tax revenues are deposited in the State Treasury to the credit of the Retail Sales Tax Fund. (Rev. & Tax. Code, § 7101.) Revenue and Taxation Code section 7102 (section 7102) governs the withdrawal and transfer of funds from the Retail Sales Tax Fund. For many years, subdivision (a) of section 7102 has provided that a portion of the sales and use taxes from motor vehicle fuel, as determined by a specified formula[3] (hereafter spillover gas tax revenue), must be trans-

---

[2] TransForm, the California Public Interest Research Group, Urban Habitat, the Planning and Conservation League, California Rural Legal Assistance, Inc., Legal Services of Northern California, and the Los Angeles Bus Riders Union have filed an amicus curiae brief in support of petitioners.

[3] The statutory formula is as follows: "All revenues, less refunds, derived under this part at the 4 3/4-percent rate, including the imposition of sales and use taxes with respect to the sale, storage, use, or other consumption of motor vehicle fuel which would not have been received if the sales and use tax rate had been 5 percent and if the motor vehicle fuel . . . , had been exempt from sales and use taxes . . . ." (§ 7102, subd. (a)(1).) Another way of stating this

ferred from the Retail Sales Tax Fund to the State Transportation Fund (Stats. 1971, ch. 1400, pp. 2770, 2785). The account receiving the spillover gas tax revenue within the State Transportation Fund has been renamed several times.[4] Since 1997, however, the account has been called the Public Transportation Account in the State Transportation Fund.[5] (Stats. 1997, ch. 622, § 32; Pub. Util. Code, § 99310.) This appeal concerns the spillover gas tax revenue that would have, but for the challenged amendments and statutes, been transferred to the PTA or would have remained in the PTA.

*Proposition 116*

At the June 1990 Primary Election, California voters adopted Proposition 116 (known as the Clean Air and Transportation Improvement Act of 1990), an initiative measure authorizing a general obligation bond issue of nearly $2 billion to fund primarily passenger and commuter rail infrastructure. (Pub. Util. Code, §§ 99600, 99601; Ballot Pamp., Primary Elec. (June 5, 1990) official title and summary of Prop. 116, p. 36.) Proposition 116 specified its bond funds could be spent on rail rights-of-way, stations and facilities, rolling stock, grade separations, related capital expenditures, paratransit vehicles, bicycle facilities, waterborne ferry vessels and facilities, and the railroad technology museum. (Pub. Util. Code, §§ 99613, 99620–99653.) The bonds were general obligation bonds, backed by the State of California (Pub. Util. Code, §§ 99690.5, 99691.5) with money appropriated from the General Fund to pay the principal and interest as those came due. (Pub. Util. Code, §§ 99693.5, 99694.) The voters expressed their intent that the "bond funds shall not be used to displace existing sources of funds for rail and other forms of public transportation, including, but not limited to, funds that have been provided pursuant to . . . the [PTA] . . . ; and that funding for public transit should be increased from existing sources including fuel taxes and sales tax on fuels." (Pub. Util. Code, § 99611 (section 99611).)

Proposition 116 amended Public Utilities Code section 99310.5 (section 99310.5) to read:

"*(a) The account* [the PTA] *is hereby designated a trust fund.*

formula, used by the Department of Finance, is the amount that gasoline sales tax revenues at the 4.75 percent rate exceed the amount generated from sales tax on all other goods at the 0.25 percent rate.

[4] An amendment to section 7102 transferred the spillover gas tax revenue specifically to the Transportation Planning and Research Account in the State Transportation Fund (Stats. 1972, ch. 1408, § 65, p. 3060), which became the Transportation Planning and Development Account in the State Transportation Fund (Stats. 1982, ch. 321, § 3, p. 1021; Stats. 1982, ch. 322, § 3, p. 1028).

[5] For convenience we will uniformly refer to the account as the PTA.

"*(b)* The funds in the account shall be available, when appropriated by the Legislature, *only* for transportation *planning and mass transportation* purposes, as specified *by the Legislature.*

"*(c) The Legislature may amend this section by statute passed in each house of the Legislature by rollcall vote entered in the journal, two-thirds of the membership concurring, if the statute is consistent with, and furthers the purposes of, this section.*" (Ballot Pamp., *supra*, text of Prop. 116, § 2, p. 73 [italics indicate language added by Prop. 116].)

Proposition 116 also amended section 7102, in pertinent part, as follows:

"The money in the fund [Retail Sales Tax Fund] shall, upon order of the Controller, . . . be transferred in the following manner:

"(a)(1) [Spillover gas tax revenue], shall be estimated by the State Board of Equalization, with the concurrence of the Department of Finance, and shall be transferred ~~during each fiscal year~~ *quarterly* to the [PTA], *a trust fund* in the State Transportation Fund ~~for appropriation pursuant to Section 99312 of the Public Utilities Code.~~

"(2) All revenues, less refunds, due to *derived under this part from* the imposition of sales and use taxes on fuel, as defined for purposes of the Use Fuel Tax Law (Part 3 (commencing with Section 8601)) ~~at the 4¾ percent rate shall be transferred during each fiscal year to the Transportation Planning and Development Account for appropriation pursuant to Section 99312 of the Public Utilities Code.~~

"~~(b) All revenues, less refunds, derived under this part at the 4¾ percent rate, resulting from increasing, after December 31, 1989, the rate of the tax imposed pursuant to the Motor Vehicle Fuel License Tax Law on motor vehicle fuel, as defined for purposes of that law, shall be transferred during each fiscal year to the Transportation Planning and Development Account for appropriation pursuant to Section 99312 of the Public Utilities Code.~~

"~~(c) All revenues, less refunds, derived under this part from a rate of more than 4¾ percent pursuant to Sections 6051.1 and 6201.1 shall be transferred to the Disaster Relief Fund created by Section 16419 of the Government Code,~~ *shall be estimated by the State Board of Equalization, with the concurrence of the Department of Finance, and shall be transferred quarterly to the [PTA], a trust fund in the State Transportation Fund.*

"~~(d)~~*(b)* The balance shall be transferred to the General Fund.

"~~(e)~~*(c)* The ~~estimate~~ *estimates* required by ~~subdivisions~~ *subdivision* (a) ~~and (b)~~ shall be based on taxable transactions occurring during a calendar year, and the transfers required by subdivision (a) shall be made during the fiscal year that commences during that same calendar year. Transfers required by paragraphs (1) and (2) ~~of subdivisions (a) and (b)~~ shall be made quarterly.

"*(d) The Legislature may amend this section, by statute passed in each house of the Legislature by rollcall vote entered in the journal, two-thirds of the membership concurring, if the statute is consistent with, and furthers the purposes of, this section.*" (Ballot Pamp., *supra*, text of Prop. 116, § 4, p. 74 [italics indicate language added by Prop. 116 while strikethroughs indicate language deleted by Prop. 116].)

*Proposition 2*

In 1998, voters approved Proposition 2, a legislative constitutional amendment, adding article XIX A to the California Constitution. (Cal. Const., art. XIX A (Article XIX A); Ballot Pamp., Gen. Elec. (Nov. 3, 1998) Prop. 2, official title and summary, p. 10.) As relevant here, Article XIX A requires loans of state transportation funds from the PTA to the state General Fund to be repaid in full generally within the fiscal year in which the loan is made or within three fiscal years from the date on which the loan was made if the Governor proclaims a fiscal emergency or if the estimated General Fund revenues for the current year are less than the General Fund revenues for the prior year. (Art. XIX A, § 1.)

*Proposition 42*

In 2002, voters approved Proposition 42, another legislative constitutional amendment, adding article XIX B to the California Constitution. (Cal. Const., art. XIX B (Article XIX B); Voter Information Guide, Primary Elec. (Mar. 5, 2002) official title and summary of Prop. 42, p. 14.) Art. XIX B requires the portion of gas sales and use tax revenue formerly deposited in the state General Fund (nonspillover gas tax revenue) to be transferred instead to a new fund in the State Treasury called the Transportation Investment Fund. (Art. XIX B, § 1, subd. (a).) Article XIX B specifies how the gas sales and use tax revenue in the Transportation Investment Fund is to be allocated, directing specific amounts and percentages of revenue to state and local entities for street and highway maintenance, general transportation and public/mass transportation purposes. (Art. XIX B, § 1, subd. (b); Rev. & Tax. Code, former § 7104, as amended by Stats. 2001, ch. 113, § 9.)

Article XIX B allows the transfer of revenue from the General Fund to the Transportation Investment Fund to be suspended in whole or in part in times of severe state fiscal hardship if particular conditions are met. (Art. XIX B, § 1, subd. (d); Voter Information Guide, Primary Elec., *supra*, text of Prop. 42, p. 66.) The State partially suspended the transfer in 2003–2004 and wholly suspended the transfer in 2004–2005. (Voter Information Guide, Gen. Elec. (Nov. 7, 2006) analysis by Legis. Analyst, Prop. 1A, p. 15.)

*Proposition 1A*

In 2006, voters approved Proposition 1A, another legislative constitutional amendment, amending Article XIX B to further limit the conditions under which transfers of the nonspillover gas tax revenue to the Transportation Investment Fund can be suspended. (Art. XIX B, § 1, subd. (d); Voter Information Guide, Gen. Elec., *supra*, analysis by Legis. Analyst, Prop. 1A, p. 15.) "Specifically, the measure requires Proposition 42 suspensions to be treated as loans to the General Fund that must be repaid in full, including interest, within three years of suspension. Furthermore, the measure only allows suspension to occur twice in ten consecutive fiscal years. No suspension could occur unless prior suspensions (excluding those made prior to 2007–2008) have been repaid in full. [¶] In addition, the measure lays out a new schedule to repay the Proposition 42 suspensions that occurred in 2003–2004 and 2004–2005." (Voter Information Guide, *supra*, analysis by Legis. Analyst, Prop. 1A, p. 15; see Art. XIX B, § 1, subd. (f).)[6]

*Unchallenged Legislative Amendments to Section 7102*

Starting in 2001, the Legislature began to make annual amendments to subdivision (a)(1) of section 7102, the portion of section 7102 governing spillover gas tax revenue. (§ 7102, subd. (a)(1)(A)–(H).) Evidence was submitted to the trial court in the form of a declaration of a program budget manager for the Department of Finance that the amendments for the budget years 2001–2002 and 2002–2003 did not result in any change to the amount of money deposited in the PTA. However, starting with budget year 2003–2004 through 2006–2007, the amendments (§ 7102, subd. (a)(1)(C)–(F)) resulted in a reduction in the transfer of gas tax spillover revenue to the PTA. No legal challenge to this legislative practice was filed.

---

[6] We shall refer to the repayments required by Article XIX B, section 1, subdivision (f), as suspended transfer reimbursements.

*The Challenged Amendments, Statutes and Appropriations; the Mass Transportation Fund and the Transportation Debt Service Fund*

In 2007, as relevant here, the Legislature undertook a series of actions which added subparts (G) and (H) to subdivision (a)(1) of section 7102 of the Revenue and Taxation Code (Stats. 2007, ch. 173, § 5), added section 7103 to the same code (Stats. 2007, ch. 313, § 9), and added section 16965 to the Government Code (Stats. 2007, ch. 313, § 6). Essentially these amendments appropriated money that was otherwise directed to the PTA to various other government sources and obligations.

Section 7102, subdivision (a)(1)(G) relates to the budget year 2007–2008 and provides for the transfer of $622 million of spillover gas tax revenue to a new fund called the Mass Transportation Fund (MTF). (§ 7102, subd. (a)(1)(G).) Subdivision (a)(1)(H) of section 7102 relates to the budget year 2008–2009 and every fiscal year thereafter. (§ 7102, subd. (a)(1)(H).) As amended in 2008, subdivision (a)(1)(H) calls for the transfer of $940 million of spillover gas tax revenue to the MTF in 2008–2009 and 50 percent of the spillover gas tax revenue estimated each quarter in future years. (§ 7102, subd. (a)(1)(H).)

Revenue and Taxation Code section 7103 (section 7103), subdivision (a), creates the MTF in the State Treasury and provides that the funds transferred to the fund "may be used for, but shall not necessarily be limited to" several specified "transportation purposes." The four purposes specified by the statute include (1) payment of debt service on transportation bonds or reimbursement to the General Fund for past debt service on transportation bonds; (2) funding of the State Department of Developmental Services for regional center transportation; (3) suspended transfer reimbursements; and (4) funding of home-to-school transportation. (§ 7103, subd. (a).)

For budget year 2007–2008, appropriations were made from the MTF as follows.

Section 7103, subdivision (b), takes the money ($622 million) transferred to the MTF by section 7102, subdivision (a)(1)(G), and retransfers $539 million to a new "Transportation Debt Service Fund" and appropriates the remainder ($83 million) to current suspended transfer reimbursements. (§ 7103, subd. (b).)

Government Code section 16965 establishes the Transportation Debt Service Fund and authorizes the Director of Finance for the 2007–2008 budget year to use the $539 million transferred to the fund as follows: to reimburse the General Fund in the amount of $339 million for the purpose of

reimbursing the cost of current debt service payments on three bond propositions—$124 million for current debt service on Proposition 116 bonds, $71 million for current debt service on Proposition 108 bonds (Prop. 108 is known as the Passenger Rail and Clean Air Bond Act of 1990 and is codified at Sts. & Hy. Code, § 2701 et seq.); and $144 million for current debt service on Proposition 192 bonds (Prop. 192 is known as the Seismic Retrofit Bond Fund of 1996 and is codified at Gov. Code, § 8879 et seq.). (Gov. Code, § 16965, subds. (a), (b)(1).) Government Code section 16965 also authorizes the Director of Finance for the 2007–2008 budget year to transfer $200 million from section 7103, subdivision (b), to the General Fund for the purpose of reimbursing the cost of past debt service payments made by the General Fund for public transportation-related general obligation bond expenditures. (Gov. Code, § 16965, subd. (b)(2).) The Department of Finance has determined that this $200 million would be used to reimburse the General Fund for past debt service payments on Proposition 108 bonds.

In summary, the Legislature for the 2007–2008 budget year transferred $622 million of spillover gas tax revenue that would have otherwise gone into the PTA into a new fund, the MTF. Ultimately this money was designated to be used for five separate purposes:

(1) $83 million for current debt on suspended transfer reimbursements (§ 7103, subd. (b));

(2) $124 million for current debt on Proposition 116 bonds (Gov. Code, § 16965, subd. (b)(1)(A));

(3) $71 million for current debt on Proposition 108 bonds (Gov. Code, § 16965, subd. (b)(1)(B));

(4) $144 million for current debt on Proposition 192 bonds (Gov. Code, § 16965, subd. (b)(1)(C)); and

(5) $200 million for past debt on Proposition 108 bonds (Gov. Code, § 16965, subd. (b)(2)).

Apart from these five appropriations from the MTF, the Budget Act of 2007 also appropriated $637 million directly from the PTA for several purposes. (1) The Legislature transferred $129 million from the PTA to the State Department of Developmental Services (DDS) to pay for the costs of transporting developmentally disabled persons receiving vocational rehabilitation services to regional centers. (Stats. 2007, ch. 171, § 2.00, item No. 4300-101-0001(5) (the Budget Act of 2007).) (2) The Legislature transferred $99 million from the PTA to the Department of Education

(DOE) to fund the Home-to-School Transportation and Small School District Transportation programs. (Stats. 2007, ch. 172, § 56, item No. 6110-111-0046; Amendments and Additions to the Budget Act of 2007.) (3) The Legislature authorized the Director of Finance to reimburse the General Fund with $409 million of PTA funds to offset the cost of past debt service payments on public transportation-related general obligation bond expenditures (Stats. 2007, ch. 172, § 71 (Amendments and Additions to the Budget Act of 2007)) and the State Controller determined the $409 million should be applied to past debt service on Proposition 108 bonds.

Petitioners filed a petition for writ of mandate, declaratory relief, and injunction challenging the Legislature's 2007 amendment of section 7102, subdivision (a)(1), four of the Legislature's five appropriations for the budget year 2007–2008 from the MTF and all three of the Legislature's described appropriations for the budget year 2007–2008 from the PTA as being inconsistent with Proposition 116 and the California Constitution. Petitioners did not challenge the MTF appropriation of $70,983,363 for payment of current debt on Proposition 108 bonds. (Gov. Code, § 16965, subd. (b)(1)(B).)

The trial court concluded the Legislature validly exercised its authority to amend section 7102 to include subdivision (a)(1)(G) and (H). The trial court rejected petitioners' challenges to the four appropriations from the MTF. The trial court concluded the appropriations from the PTA to the DDS and DOE were valid as they served a mass transportation purpose within the meaning of section 99310.5. The trial court concluded, however, the transfer of $409 million to the General Fund for past debt service payments on Proposition 108 bonds was invalid as the transfer did not serve any transportation planning or mass transportation purpose and so was contrary to section 99310.5. Judgment was entered declaring the portion of the Budget Act of 2007 that authorized the $409 million transfer violated section 99310.5 and issuing a writ of mandate commanding the State to transfer $409 million from the General Fund to the PTA. The judgment denied all other claims for relief sought by petitioners.

## STANDARD OF REVIEW

Petitioners claim on appeal the trial court erred in its interpretation of section 7102 in light of Proposition 116 and Article XIX A. According to petitioners, the MTF is improper. Petitioners contend the voters intended all spillover gas tax revenue to be placed in the PTA where it would be used only for transportation planning and public transportation purposes. Petitioners claim that payment of home-to-school and small school district transportation, transit of developmentally disabled persons to regional centers, debt service on Proposition 192 bonds and reimbursement of past debt service are

not such purposes. Petitioners also claim payment of current Proposition 116 debt from spillover gas tax revenue violates Proposition 116. Petitioners claim payment of current suspended transfer reimbursements out of the PTA violates Article XIX B (Prop. 1A) and Proposition 116.

The State, in its cross-appeal, contends the trial court erred in concluding the reimbursement of past debt service on Proposition 108 bonds out of the PTA was violative of section 99310.5.

Resolution of these issues requires statutory interpretation, which we consider independently as a question of law. (*Professional Engineers v. Wilson* (1998) 61 Cal.App.4th 1013, 1020 [72 Cal.Rptr.2d 111] (*PE v. Wilson*).)

In resolving the challenges at issue in this appeal, we consider both statutes adopted by the Legislature (Rev. & Tax. Code, §§ 7102, subd. (a)(1)(G), (H), 7103; Gov. Code, § 16965; the Budget Act of 2007; Amendments and Additions to the Budget Act of 2007) and statutes and state constitutional provisions adopted by the voters of California (§ 7102; Pub. Util. Code, §§ 99310.5, 99611; Cal. Const., art. XIX A (Prop. 2), article XIX B (Props. 42 & 1A).

█ We keep in mind that "[u]nlike the federal Constitution, which is a grant of power to Congress, the California Constitution is a limitation or restriction on the powers of the Legislature. [Citations.] Two important consequences flow from this fact. [¶] First, the entire law-making authority of the state, except the people's right of initiative and referendum, is vested in the Legislature, and that body may exercise any and all legislative powers which are not expressly or by necessary implication denied to it by the Constitution. [Citations.] In other words, 'we do not look to the Constitution to determine whether the [L]egislature is authorized to do an act, but only to see if it is prohibited.' [Citation.] [¶] Secondly, all intendments favor the exercise of the Legislature's plenary authority: 'If there is any doubt as to the Legislature's power to act in any given case, the doubt should be resolved in favor of the Legislature's action. [¶] Such restrictions and limitations [imposed by the Constitution] are to be construed strictly, and are not to be extended to include matters not covered by the language used.' [Citations.]" (*Methodist Hosp. of Sacramento v. Saylor* (1971) 5 Cal.3d 685, 691 [97 Cal.Rptr. 1, 488 P.2d 161]; accord, *State Personnel Bd. v. Department of Personnel Admin.* (2005) 37 Cal.4th 512, 523 [36 Cal.Rptr.3d 142, 123 P.3d 169].)

█ We are particularly cognizant that "[t]he enactment of a budget bill is a legislative function; it is both a right and a duty that is expressly placed upon the Legislature and the Governor by our state Constitution."

(*Schabarum v. California Legislature* (1998) 60 Cal.App.4th 1205, 1214 [70 Cal.Rptr.2d 745]; see Cal. Const., art. IV, § 12.) Nevertheless, even in matters involving the state budget, "[t]he courts have the responsibility for determining the constitutionality of acts of the Legislature, and in doing so to give effect to the will of the electorate which is, of course, paramount. [Citation.]" (*Schabarum, supra*, at p. 1218.)

■ The will of the electorate is involved in our consideration of initiative measures like Proposition 116 as well as Article XIX A and Article XIX B. Statutes and constitutional provisions adopted by the voters "must be construed liberally in favor of the people's right to exercise the reserved powers of initiative and referendum. The initiative and referendum are not rights 'granted the people, but . . . power[s] reserved by them. Declaring it "the duty of the courts to jealously guard this right of the people" [citation], the courts have described the initiative and referendum as articulating "one of the most precious rights of our democratic process" [citation]. "[I]t has long been our judicial policy to apply a liberal construction to this power wherever it is challenged in order that the right not be improperly annulled. If doubts can reasonably be resolved in favor of the use of this reserve power, courts will preserve it." ' [Citations.]" (*Rossi v. Brown* (1995) 9 Cal.4th 688, 694–695 [38 Cal.Rptr.2d 363, 889 P.2d 557].) In fact, "[t]he people's reserved power of initiative *is* greater than the power of the legislative body. The latter may not bind future Legislatures [citation], but by constitutional and charter mandate, unless an initiative measure expressly provides otherwise, an initiative measure may be amended or repealed only by the electorate. Thus, through exercise of the initiative power the people *may* bind future legislative bodies other than the people themselves." (*Id.* at pp. 715–716.)

## DISCUSSION

### I.

### The Legislature's Amendment of Section 7102 and Creation of the MTF (Section 7103)

As the trial court recognized, the threshold issue here is the Legislature's power to amend section 7102, subdivision (a)(1). Two constitutional provisions affect our analysis.

■ First, article IV, section 9 of the California Constitution provides, in pertinent part, that "[a] section of a statute may not be amended unless the section is re-enacted as amended." "The effect of this section is that voters considering an initiative . . . that seeks to make discrete amendments to selected provisions of an existing statute, are forced to reenact the entire

statute as amended in order to accomplish the desired amendments." (*Yoshisato v. Superior Court* (1992) 2 Cal.4th 978, 990 [9 Cal.Rptr.2d 102, 831 P.2d 327], italics omitted.)

■ Second, article II, section 10, subdivision (c) of the California Constitution provides that "[t]he Legislature . . . may amend or repeal an initiative statute by another statute that becomes effective only when approved by the electors unless the initiative statute permits amendment or repeal without their approval." The purpose of this constitutional limitation on the Legislature's power to amend initiative statutes "is to 'protect the people's initiative powers by precluding the Legislature from undoing what the people have done, without the electorate's consent.' " (*Proposition 103 Enforcement Project v. Quackenbush* (1998) 64 Cal.App.4th 1473, 1484 [76 Cal.Rptr.2d 342].) The power vested in the electorate to decide whether the Legislature can amend an initiative statute " 'is absolute and includes the power to enable legislative amendment *subject to conditions attached by the voters.* [Citation.]' [Citations.]" (*Amwest Surety Ins. Co. v. Wilson* (1995) 11 Cal.4th 1243, 1251 [48 Cal.Rptr.2d 12, 906 P.2d 1112] (*Amwest*); accord, *Foundation for Taxpayer & Consumer Rights v. Garamendi* (2005) 132 Cal.App.4th 1354, 1364 [34 Cal.Rptr.3d 354].)

■ Consequently, when section 7102 was amended in 1990 by Proposition 116, it was actually reenacted in its entirety as amended. (Cal. Const., art. IV, § 9.) At that point, any subsequent amendment to any portion of section 7102 (remembering this is the statute governing the withdrawal and transfer of virtually all of the state's retail sales and use tax revenue) would require approval of the voters to be effective, except that Proposition 116 expressly included conditional authority for Legislative amendment. (Cal. Const., art. II, § 10.) Proposition 116 provided that "[t]he Legislature may amend this section, by statute passed in each house of the Legislature by rollcall vote entered in the journal, two-thirds of the membership concurring, *if the statute is consistent with, and furthers the purposes of this section.*" (§ 7102, subd. (e), formerly subd. (d), italics added (hereafter section 7102(e)).) Thus, the meaning of the italicized phrase contained in section 7102(e) is of paramount importance to our decision on this issue.

The validity of the Legislature's amendment of section 7102, subdivision (a)(1) to add subparts (G) and (H), which transfer a portion of spillover gas tax revenue to the MTF rather than to the PTA, depends on whether such amendment "is consistent with, and furthers the purposes of this section." Although the initiative's limitation of the Legislature's authority to amend section 7102 to provisions "consistent with, and [that] further[] the purposes of this section" must be strictly construed, "it also must be given the effect the voters intended it to have" (*Amwest, supra,* 11 Cal.4th at

pp. 1255–1256). In line with *Amwest*, we start "with the presumption that the Legislature acted within its authority" (*id.* at pp. 1253, 1256) and uphold the validity of section 7102, subdivision (a)(1)(G) and (H) "if, by any reasonable construction" (*Amwest, supra*, at p. 1256), it can be said those subparts are "consistent with, and further[] the purposes of this section" (§ 7102(e)).

■ In determining what the voters meant by "consistent with, and further[] the purposes of this section" (§ 7102(e)), " 'we apply the same principles that govern statutory construction. [Citation.] Thus, "we turn first to the language of the [initiative], giving the words their ordinary meaning." [Citation.]' " (*Professional Engineers in California Government v. Kempton* (2007) 40 Cal.4th 1016, 1037 [56 Cal.Rptr.3d 814, 155 P.3d 226]; see *DaFonte v. Up-Right, Inc.* (1992) 2 Cal.4th 593, 601 [7 Cal.Rptr.2d 238, 828 P.2d 140].) "We do not examine that language in isolation, but in the context of the statutory framework as a whole in order to determine its scope and purpose and to harmonize the various parts of the enactment. If the language is clear, courts must generally follow its plain meaning unless a literal interpretation would result in absurd consequences the [voters] did not intend. If the statutory language permits more than one reasonable interpretation, courts may consider other aids, such as the statute's purpose, legislative history, and public policy. [Citations.]" (*Coalition of Concerned Communities, Inc. v. City of Los Angeles* (2004) 34 Cal.4th 733, 737 [21 Cal.Rptr.3d 676, 101 P.3d 563].) " 'Absent ambiguity, we presume that the voters intend the meaning apparent on the face of an initiative measure [citation] and the court may not add to the statute or rewrite it to conform to an assumed intent that is not apparent in its language.' [Citation.]" (*Professional Engineers in California Government v. Kempton, supra*, at p. 1037.)

The trial court concluded the term "section" in section 7102(e) has a plain meaning. Specifically, it found the accepted legal meaning of "section" refers to section 7102 as a whole, not its subdivisions. Even if ambiguous, the trial court found no extrinsic evidence of intent in the ballot materials for Proposition 116 or anywhere else to suggest "the voters intended to preclude the Legislature from changing the amount of sales and use tax revenues allocated to the [PTA]." The trial court concluded the purpose of section 7102 was "to provide for the distribution of all state sales and use tax revenues that have been deposited in the Retail Sales Tax Fund." It determined that section 7102, subdivision (a)(1)(G) and (H) "[is] consistent with and further[s] the purposes of section 7102 because the amendments distribute sales and use tax revenues for the general operation of the government." Therefore, it concluded the amendments are valid.

■ We agree with the trial court that the term "section" has a plain and customary meaning that references section 7102 as a whole. In fact, the

Revenue and Taxation Code recognizes this common legal meaning when it references the division of the code into "Division, part, chapter, article, and section." (Rev. & Tax. Code, § 6.) This common understanding of the term can be inferred from the provision in the Revenue and Taxation Code specifically providing that " '[s]ection' means a section of this code unless some other statute is specifically mentioned and 'subdivision' means a subdivision of the section in which that term occurs unless some other section is expressly mentioned." (Rev. & Tax. Code, § 10.) Where a word or phrase in a statute has an accepted legal meaning, courts will adopt that definition, unless a contrary legislative intent appears. (*Texas Commerce Bank v. Garamendi* (1992) 11 Cal.App.4th 460, 475 [14 Cal.Rptr.2d 854].)

We part company with the trial court, however, in its understanding of the phrase "consistent with, and furthers the purposes of this section." (§ 7102(e).) The trial court's interpretation of the purpose of section 7102 and the phrase "consistent with, and furthers the purposes of this section" (§ 7102(e)) as allowing "[any] amendment[] distribut[ing] sales and use tax revenues for the general operation of the government[]" essentially amounts to a conclusion that any withdrawal or transfer of sales and use tax revenue from the Retail Sales Tax Fund is valid after Proposition 116 as long as it is a withdrawal or transfer of sales and use tax revenue from the Retail Sales Tax Fund.

We reject the trial court's conclusion in part because the voters could have accomplished this by simply allowing the Legislature to amend the section, period. The trial court's interpretation renders meaningless the additional phrase that the amendment must be "consistent with, and further[] the purposes of this section." We conclude it is not plainly evident what the voters meant by such phrase. True, the voters did not state that any amendment of section 7102 by the Legislature must further the purposes of Proposition 116. (Cf. *Amwest Surety Ins. Co. v. Wilson, supra,* 11 Cal.4th at p. 1251; *Foundation for Taxpayer and Consumer Rights v. Garamendi, supra,* 132 Cal.App.4th at p. 1365; *Proposition 103 Enforcement Project v. Quackenbush, supra,* 64 Cal.App.4th at p. 1484.) However, the lack of language in section 7102(e) limiting amendments to those that further only the purposes of Proposition 116 is perhaps understandable because, as the trial court put it, "section 7102 is a bucket-type distribution statute that governs the disposition of all state sales and use taxes deposited into the Retail Sales Tax Fund." If section 7102(e) had limited amendments of the "section" to those that further the purposes of Proposition 116, it would have arguably imposed Proposition 116's purposes on the Legislature's ability to deal with all of the sales and use tax revenue in the Retail Sales Tax Fund. Considerable legal uncertainty would have resulted when nothing in Proposition 116 suggests an intent to change the Legislature's ability to generally deal with the state's sales and use tax revenue.

It is also true that Proposition 116 did not include language in section 7102(e) similar to Public Utilities Code section 99605, added by Proposition 116. Section 99605 limits amendment of "this part" (the Clean Air and Transportation Improvement Act of 1990; Pub. Util. Code, § 99600) to statutes consistent with and that further the purposes of "this part." (Pub. Util. Code, § 99605.) Section 99605 then states: "No changes shall be made in the way in which funds are allocated pursuant to Chapter 3 (commencing with Section 99620), except pursuant to Section 99684." Certainly if section 7102(e) contained a similar express limitation for spillover gas tax revenues transferred to the PTA under section 7102, subdivision (a)(1), there would be no issue of interpretation here. The failure of Proposition 116 to include a specific restriction of amendments to section 7102, subdivision (a)(1) in section 7102(e) when it included a specific limitation in section 99605 may be evidence that the voters did not intend such a restriction. (See *People v. Goodloe* (1995) 37 Cal.App.4th 485, 491 [44 Cal.Rptr.2d 15]; *Engs Motor Truck Co. v. State Bd. of Equalization* (1987) 189 Cal.App.3d 1458, 1470 [235 Cal.Rptr. 117].) On the other hand, examination of the legislation's purpose and application of other canons of statutory construction may suggest the omission is an oversight. (*People v. Goodloe, supra*, at p. 491; *Engs Motor Truck Co. v. State Bd. of Equalization, supra*, at p. 1470.)

■ In interpreting a statute we are required, if possible, to give significance and effect to each word and phrase and to avoid a construction that makes any part of the statute superfluous or meaningless. (*Curle v. Superior Court* (2001) 24 Cal.4th 1057, 1063 [103 Cal.Rptr.2d 751, 16 P.3d 166]; *California Mfrs. Assn. v. Public Utilities Com.* (1979) 24 Cal.3d 836, 844 [157 Cal.Rptr. 676, 598 P.2d 836]; *San Diego Police Officers Assn. v. City of San Diego Civil Service Com.* (2002) 104 Cal.App.4th 275, 284 [128 Cal.Rptr.2d 248]; 2A Singer & Singer, Statutes and Statutory Construction (7th ed. 2007) Statutory Interpretation, § 46:6, pp. 230–247.)

■ Unlike the trial court, we conclude that the voters in including the phrase "consistent with, and furthers the purposes of this section" in section 7102(e) meant something more than the Legislature may amend the section. The phrase is language of limitation. To determine the nature of the limitation we turn to the terms of Proposition 116 so that we may consider section 7102(e) in the context of the entire initiative of which it is part.[7] (*DuBois v. Workers' Comp. Appeals Bd.* (1993) 5 Cal.4th 382, 388 [20 Cal.Rptr.2d 523, 853 P.2d 978].)

---

[7] There is no discussion of the sections at issue in this case in the ballot materials for Proposition 116 that we can consider as extrinsic evidence of the voters' intent. We do not agree with the State that the statement by the proponents of Proposition 116 that the proposition "will not take away funding from any other necessary social program" (Ballot Pamp., Primary Elec., *supra*, rebuttal to argument against Prop. 116, p. 39), is a reliable

Proposition 116 authorized the issuance of almost $2 billion of general obligation bonds to fund primarily passenger and commuter rail infrastructure. (Pub. Util. Code, §§ 99600, 99601; Ballot Pamp., *supra*, official title and summary of Prop. 116, p. 36.) The voters expressed their intent that the "bond funds shall not be used to displace existing sources of funds for rail and other forms of public transportation, including, but not limited to, funds that have been provided pursuant to . . . the [PTA] . . . ; and that funding for public transit should be increased from existing sources including fuel taxes and sales tax on fuels." (§ 99611.)

By amendment to section 99310.5, the voters designated the PTA a trust fund and changed the purposes for which the PTA funds could be used from transportation purposes to "transportation planning and mass transportation purposes." (§ 99310.5, subd. (b).) Proposition 116 also amended section 7102 to provide for more frequent transfers of spillover gas tax revenue to the PTA, which again was referred to as a trust fund. (§ 7102, subd. (a)(1).) Section 7102, subdivision (a)(1) provided the estimated spillover gas tax revenue "shall be transferred" to the PTA. As amended by Proposition 116, the language of section 7102, subdivision (a)(1) stopped there. (Ballot Pamp., *supra*, text of Prop. 116, § 4, p. 74.) It did not include the language "except as modified as follows." That qualifier was added in 2006 by the Legislature. (Stats. 2006, ch. 56, § 4.)

 When the provisions of Proposition 116 are read in context and harmonized together, we conclude the voters in adopting Proposition 116 intended to add a new source of money (the proposition's bond funds) for public transportation projects, to convert the PTA to a trust fund dedicated to supporting transportation planning and mass transportation projects, and to preserve the funding of the PTA for such projects with spillover gas tax revenue according to the formula specified in section 7102, subdivision (a)(1). A constant amount of spillover gas tax revenue is not guaranteed, but if the formula results in there being spillover gas tax revenue it must be transferred to the PTA for use in accordance with section 99310.5. The voters' intent to preserve spillover gas tax funding of the PTA would be frustrated if the Legislature could amend section 7102, subdivision (a)(1) to modify the amount of spillover gas tax revenue making it to the PTA.

We conclude, therefore, the language of section 7102(e) that allows legislative amendment of "this section" if the amendment is "consistent with,

statement of voter intent that section 7102(e) allow the Legislature unrestricted authority to change the use of spillover gas tax revenues. The statement appears as rebuttal to the opponents claim that Proposition 116 would require new taxes or fewer public expenditures on services (Ballot Pamp., *supra*, rebuttal to argument in favor of Prop. 116, p. 38) and is best understood as addressing the obligation of the General Fund to pay the principal and interest on the bonds.

and furthers the purposes of this section" must be read to authorize the Legislature to amend any part of the section 7102 statute as long as the amendment is consistent with and furthers the purposes of that particular part of the statute. In the case of amendments to subdivision (a)(1) of section 7102, legislative amendments must be consistent with the purposes of the PTA as described by Public Utilities Code section 99310.5, subdivision (b). That is, amendments to subdivision (a)(1) of section 7102 may appropriate these trust funds only for transportation planning or mass transportation purposes. Since subdivision (a)(1)(G) and (H) of section 7102 transfer spillover gas tax revenue to the MTF, a fund with purposes not limited to those identified by section 99310.5, there is no "reasonable construction" (*Amwest, supra*, 11 Cal.4th at p. 1256) by which subdivision (a)(1)(G) and (H) can be said to be consistent with, and further the purpose of, the portion of section 7102 that they amend. They are invalid.

We find further support for our interpretation of section 7102(e) in the Legislature's action in submitting Proposition 2 to the voters in the November 1998 General Election. (Art. XIX A; Ballot Pamp., *supra*, Prop. 2, official title and summary prepared by the Attorney General, p. 10.) As relevant here, Article XIX A restricts the conditions under which funds from the PTA may be *loaned* to the state General Fund. (Art. XIX A, § 1.) If the Legislature could reduce transfers of revenue to or divert revenue from the PTA to the benefit of the General Fund by means of an amendment to section 7102, subdivision (a)(1), a loan procedure would be unnecessary. The fact that the Legislature believed revenue in the PTA could be tapped only through loans, as evidenced by its submission of Proposition 2 to the electorate, reflects its understanding of the effect of Proposition 116 consistent with our opinion. This understanding also comports with our conclusion as to the nature and scope of the intent of Proposition 116 and section 7102(e).

██ Our conclusion does not mean the Legislature's creation of the MTF (§ 7103) is improper or invalid. The Legislature has plenary lawmaking authority over the state's budget (Cal. Const., art. IV, § 12) and we are aware of no constitutional prohibition precluding it from creating specific funds in the State Treasury for any number of governmental purposes. (See *Methodist Hosp. of Sacramento v. Saylor, supra*, 5 Cal.3d at p. 691; *Schabarum v. California Legislature, supra*, 60 Cal.App.4th at pp. 1213–1215.) ██ We only conclude that subdivision (a)(1)(G) of section 7102 transferring millions of spillover gas tax revenue to the MTF in budget year 2007–2008 and subdivision (a)(1)(H) regarding the continuous transfer of millions of spillover gas tax revenue in 2008–2009 and each fiscal year thereafter are invalid. The source of the revenue in the MTF may not be spillover gas tax revenue that would otherwise have been transferred to the PTA pursuant

to section 7102, subdivision (a)(1). The voters, through Proposition 116, have precluded such amendment of section 7102, subdivision (a)(1).

## II.

### Use of PTA Revenue for Transportation Planning and Mass Transportation Purposes

Although we have concluded the Legislature's amendment of section 7102, subdivision (a)(1) to add subparts (G) and (H) transferring PTA money to the MTF was invalid, the funds transferred to the MTF in the 2007–2008 budget year may nevertheless have been validly appropriated if they were actually used for "transportation planning and mass transportation purposes" as required for PTA funds. (§ 99310.5.) In fact, petitioners concede the appropriation of $71 million to pay *current* debt service on Proposition 108 (the Passenger Rail and Clean Air Bond Act of 1990; Sts. & Hy. Code, § 2701 et seq.) bonds was a transportation planning and mass transportation purpose. Petitioners argue, however, that of the 2007–2008 budget year appropriations from the MTF, two of the other four appropriations (the $144 million for current debt on Proposition 192 bonds (Gov. Code, § 16965, subd. (b)(1)(C)) and the $200 million, for *past* debt on Proposition 108 bonds (Gov. Code, § 16965, subd. (b)(2))), were not for mass transportation purposes.

As to appropriations from the PTA itself for budget year 2007–2008, petitioners contend all three were not for mass transportation purposes. The trial court disagreed with petitioners and found that all appropriations from the MTF were valid. As to appropriations from the PTA, the trial court agreed with petitioners that the $409 million transferred to the General Fund to reimburse the General Fund for past debt service on Proposition 108 bonds was invalid. It rejected petitioners' claims regarding the transfers of $129 million from the PTA to the DDS to pay for the costs of transporting developmentally disabled persons receiving vocational rehabilitation services to regional centers and the transfer of $99 million from the PTA to the DOE to fund the Home-to-School Transportation and Small School District Transportation programs.

Petitioners argue on appeal the trial court erred in its conclusion as to these last two appropriations from the PTA to the DDS and the DOE, and the State contends in its cross-appeal that the trial court erred as to its first conclusion.

Finally, we also consider here petitioners' challenge to the Legislature's transfer of $83 million from the MTF to the General Fund for suspended transfer reimbursements as violative of Proposition 116 and Article XIX B.

The validity of such transfer is also resolved by consideration of whether it was a transfer for transportation planning or mass transportation purposes.

To determine these issues, we first consider the meaning of "mass transportation" as used in section 99310.5. Next we consider whether appropriations for payment of Proposition 192 debt, for costs of transporting the developmentally disabled to regional centers, and for transporting some school children are such mass transportation purposes. Then we address the question of whether reimbursement of the General Fund for its past debt service on an undisputed mass transportation bond fund is a mass transportation purpose within the meaning of section 99310.5. Finally, we consider the transfer of money from the MTF for suspended transfer reimbursements.

## A. The Meaning of "Mass Transportation" As Used in Section 99310.5

Proposition 116 amended section 99310.5 to designate the PTA a trust fund and to change the purposes for which the PTA funds could be used from transportation purposes to "transportation planning and mass transportation purposes."[8] (§ 99310.5, subd. (b).) The term "mass transportation" is not defined. The trial court agreed with petitioners that the term should be equated with "public" transit or transportation. The State urges us to adopt instead a dictionary meaning of mass transportation as "a means or system of conveying a large number of people." We conclude the trial court got it right.

In interpreting the meaning of "mass transportation" as used in section 99310.5, our paramount task is to ascertain the intent of the voters who enacted section 99310.5 so that our construction best effectuates the purpose of the law. (*Gattuso v. Harte-Hanks Shoppers, Inc.* (2007) 42 Cal.4th 554, 567 [67 Cal.Rptr.3d 468, 169 P.3d 889]; *Professional Engineers in Cal. Government v. Kempton, supra*, 40 Cal.4th at p. 1037.) We start with the statute's words, "giving them their ordinary and usual meaning and viewing them in their statutory context, because the statutory language is usually the most reliable indicator of legislative intent." (*Gattuso v. Harte-Hanks Shoppers, Inc., supra*, at p. 567.) The plain meaning of the words controls unless the words are ambiguous. (*Green v. State of California* (2007) 42 Cal.4th 254, 260 [64 Cal.Rptr.3d 390, 165 P.3d 118].) "If the statutory

---

[8] Section 99310.5 provides the funds in the PTA account are available only "for transportation planning and mass transportation purposes, *as specified by the Legislature.*" (Italics added.) The italicized phrase authorizes the Legislature to determine the particular transportation planning and mass transportation purposes that will be funded by the PTA, but, as the trial court stated, "it does not give the Legislature the power to define 'mass transportation' to mean something different than what was intended by the voters. (See *C & C Construction, Inc. v. Sacramento Municipal Utility Dist.* (2004) 122 Cal.App.4th 284, 300–302 [18 Cal.Rptr.3d 715] [holding Legislature lacks constitutional authority to re-define 'discrimination' for purposes of Proposition 209].)"

language is ambiguous and susceptible of differing constructions, we may reasonably infer that the legislators intended an interpretation producing practical and workable results rather than one resulting in mischief or absurdity. (See *In re Reeves* (2005) 35 Cal.4th 765, 771, fn. 9 [28 Cal.Rptr.3d 4, 110 P.3d 1218], and cases cited.) It is a fundamental tenet of statutory construction that we must give the statute a *reasonable* construction conforming to legislative intent. (*Gattuso, supra,* 42 Cal.4th at p. 567.)" (*City of Santa Monica v. Gonzalez* (2008) 43 Cal.4th 905, 919 [76 Cal.Rptr.3d 483, 182 P.3d 1027].)

The State argues the plain and usual meaning of "mass transportation" may be determined by reference to the dictionary definitions of "mass" and "transportation." Since the dictionary "defines the word 'mass' as meaning 'of a large number of things; large-scale,' 'of a large number of persons,' and 'of, characteristic of, or for the masses . . .' (Webster's New World Dictionary (Third College Ed.) at p. 832 . . .)" and transportation "as 'a means or system of conveyance' or 'the work or business of conveying passengers or goods . . .' ([*i*]*d.* at p. 1422 . . .)," the State contends "the dictionary definition of 'mass transportation' is a means or system of conveying a large number of people."

The first problem with this approach is that the words "mass" and "transportation" have multiple dictionary meanings that may be combined to reach not only the State's proposed definition, but a definition of public transportation as well. (See, e.g., Webster's 3d New Internat. Dict. (1986) pp. 1388 ["mass" defined as "of, relating to, *designed for, serving,* or characteristic of the mass of the people (italics added)"], 2430 ["transport" defined as "a system or organized means of *public* conveyance or travel" (italics added)].)

The more fundamental problem with the State's proffered meaning is its failure to provide a reasonable and workable distinction from "transportation purposes" generally. Proposition 116 deleted "transportation purposes" from section 99310.5 and substituted "transportation planning and mass transportation purposes." Clearly, a limiting change was intended by the use of the term "mass transportation." Yet the State's suggestion that PTA funds may be used for any transportation purpose "that serves multiple people[]" can cover virtually any State transportation project, including any street, highway or bridge. The qualifier that the project serve "multiple people" is meaningless as there is no clear, nonarbitrary means of determining exactly how many people are necessary to qualify as "multiple" people and we assume all of the State's transportation projects benefit and serve more than one individual. The State's construction of the term "mass transportation" renders the amendment of section 99310.5 superfluous.

 Moreover, the State's interpretation does not effectuate the stated intent of the electorate in adopting Proposition 116. Proposition 116 was adopted to provide new bond revenue to fund primarily passenger and commuter rail infrastructure. These are clearly means of "public" transportation. The voters expressed their intent that the "bond funds shall not be used to displace existing sources of funds for rail and other forms of *public transportation* . . . ; and that funding for *public transit* should be increased from existing sources including fuel taxes and sales tax on fuels." (§ 99611, italics added.) Given this context, it appears the voters intended the term "mass transportation" in section 99310.5 to be synonymous with "public transportation" or "public transit." Such interpretation accords a reasonable construction to the term "mass transportation" in light of the voter's intent.[9]

Our interpretation is consistent with how California's Department of Transportation apparently views the term "mass transportation." We note the Department of Transportation structurally includes a "Division of Mass Transportation" that provides technical assistance to agencies responsible for public transportation. (See <http://www.dot.ca.gov/hq/MassTrans/AboutUs.htm> [as of June 30, 2009].)[10] In its Web site description of the responsibilities and objectives of the Division of Mass Transportation, the Department of Transportation uses the term "mass transportation" as the equivalent of public transportation. (<http://www.dot.ca.gov/hq/MassTrans/AboutUs.htm> [as of June 30, 2009].) The Department of Transportation's definition on its Web site of the term "mass transportation" is "[t]ransportation by bus, or rail, or other conveyance, either publicly or privately owned, which provides to the public general or special service[] on a regular and continuing basis. [(]Does not include school buses, charter, or sightseeing service). See also 'Public Transportation.' " (<http://www.dot.ca.gov/hq/MassTrans/Transit-Info-Terms.htm#anchor1297679> [as of June 30, 2009].)

Our interpretation of mass transportation as public transportation is also consistent with how the terms are defined by the federal Urban Mass

---

[9] Article XIX B, adopted by the voters in 2002, provides for the transfer of nonspillover gas tax revenue from the General Fund to the Transportation Investment Fund. (Art. XIX B, § 1, subd. (a).) It is instructive to note Article XIX B lists separately "[p]ublic transit and mass transportation" purposes from "[s]treet and highway" purposes for which the moneys in the Transportation Investment Fund may be used. (Art. XIX B, § 1, subd. (b)(2)(A), (C), (D).) This accords with our understanding of mass transportation purposes in this area of law as something different from general transportation purposes.

[10] The briefs of petitioners and amicus curiae refer us to the Department of Transportation's Web site. The Web site shows the structure of the Department of Transportation and provides the department's definition of the term "mass transportation." Such matters are relevant and may be judicially noticed as official acts and public records. (Evid. Code, § 452, subds. (c), (h).) We, therefore, take judicial notice of the Web site. (Evid. Code, § 459; see *Moehring v. Thomas* (2005) 126 Cal.App.4th 1515, 1524, fn. 5 [25 Cal.Rptr.3d 118].) A printed copy of all Web site references will be retained by the court.

Transportation Act of 1964 (49 U.S.C. § 5301 et seq.), which "was enacted in order to provide financial assistance to state and local governments for the development and operation of mass transportation systems." (*Stockton Metropolitan Transit Dist. v. Amalgamated Transit Union* (1982) 132 Cal.App.3d 203, 207 [183 Cal.Rptr. 24].) Section 5302 defines the term "mass transportation" for purposes of such law to "mean public transportation." (49 U.S.C. § 5302(a)(7).)

The trial court correctly determined the voters intended "mass transportation" in section 99310.5 to be the same as "public transit" or "public transportation."

B. *The Legislature's Appropriations for Current Debt Service on Proposition 192 Bonds, for Transportation of the Developmentally Disabled, and for Transportation of School Children*

Having concluded the term "mass transportation" in section 99310.5 should be interpreted to mean public transit or public transportation, we now apply our statutory construction of section 99310.5 to three of the Legislature's 2007–2008 appropriations.

*Current Debt Service for Proposition 192*

To begin with, we consider the Legislature's appropriation of $144 million from the MTF for the payment of current debt service on Proposition 192 bonds. Proposition 192 is known as the Seismic Retrofit Bond Fund of 1996. (Gov. Code, § 8879, subd. (a).) Government Code section 8879.3 provides that the proceeds of Proposition 192 bonds are to be used "for the seismic retrofit of state-owned highways and bridges, including toll bridges, throughout the state." (Gov. Code, § 8879.3, subd. (a).) Bond funds "may be used to match any available federal funds for transportation purposes or may be used without matching federal funds to reconstruct, replace, or retrofit state-owned highways and bridges, including toll bridges." (*Ibid.*) It is clear from these statements that payment of current debt service on Proposition 192 bonds is not funding a "mass transportation" purpose within the meaning of section 99301.5, but a general transportation purpose. The State argues it may nevertheless be a "transportation planning" purpose because substantial planning is required for the seismic retrofitting of highways and bridges. We do not doubt a great deal of planning is necessary for projects funded by Proposition 192, but it is not planning "transportation." It is planning for reconstruction, replacement, and retrofitting of highways and bridges. The 2007–2008 appropriation of revenue in the MTF for the purpose of debt service on Proposition 192 bonds (Gov. Code, § 16965, subd. (b)(1)(C)) violates the purposes of section 99310.5 and is invalid.

*Appropriations to the DOE and to DDS*

We next consider the Legislature's appropriation from the PTA of $99 million to the DOE for the Home-to-School and Small School District Transportation programs (Ed. Code, §§ 41850 et seq., 42290 et seq.) and $129 million to the DDS for transportation of the developmentally disabled to regional centers. It was the trial court's view that "mass transportation services may include not only general transportation services provided to the public at large, but also specialized transportation services indiscriminately provided to some portion of the public." The trial court concluded transporting public school children and the disabled was a specialized service of mass transportation within the meaning of section 99310.5. We disagree.

While public transportation may include both general and specialized services, the critical point is that the transportation is provided indiscriminately to the public. (See Pub. Util. Code, § 99211; see also 49 U.S.C. § 5302(a)(10).) Thus, special services may be necessary to enable the disabled or the elderly to have comparable access to public transportation through, for example, paratransit or demand responsive services. (See, e.g., 49 C.F.R. § 37.121 (2008).) But provision of transportation for public school children is not providing school children with access to public transportation. It is providing transportation service to a discrete portion of the public that is not available to the general public. (See *Rochester-Genesee Regional Transit Authority v. Hynes-Cherin* (W.D.N.Y. 2008) 531 F.Supp.2d 494, 499 [school bus routes must be open to the public to receive federal public transit funding].) The same is true with the program for transporting developmentally disabled persons to regional centers. This is not a special service to enable the developmentally disabled access to public transportation. This is a transportation service to a discrete population (developmentally disabled persons who have transportation services as part of their individual program plans) (Welf. & Inst. Code, § 4648; Cal. Code Regs., tit. 17, § 58510, subd. (a)(1)) that is not available to the general public. Transportation services for school children and for the developmentally disabled are worthy causes, which the Legislature may well consider important to financially support. We conclude only that they are not "mass transportation" purposes within the meaning of section 99310.5.[11] They may not be funded with revenue from the PTA. The 2007–2008 appropriations from the PTA for such purposes are invalid.

---

[11] While not determinative, we note the Legislature itself lists funding for these school transportation programs and the regional center transportation program as for "transportation" not "mass transportation" purposes in section 7103. (§ 7103, subd. (a)(2), (4).)

## C. *Payment of Past Debt Service, As a Mass Transportation Purpose*

The Legislature authorized two transfers in the 2007–2008 budget year for the purpose of reimbursing the cost of past debt service payments made by the General Fund on Proposition 108 bonds (the Passenger Rail and Clean Air Bond Act of 1990; Sts. & Hy. Code, § 2701 et seq.). First, Government Code section 16965, subdivision (b)(2), authorized the transfer of $200 million to the General Fund for past debt service on Proposition 108 bonds from the Transportation Debt Service Fund. This was an indirect use of PTA revenue since the MTF funded the Transportation Debt Service Fund (§ 7103, subd. (b)) and we have already determined the MTF was wrongfully funded with spillover gas tax revenue that should have been transferred to the PTA. Second, the Legislature authorized the transfer of $409 million directly from the PTA to reimburse the General Fund for such past debt service payments on Proposition 108 bonds. (Stats. 2007, ch. 172, § 71 (Amendments and Additions to the Budget Act of 2007).)

Petitioners challenged these transfers claiming they were improper because (1) they were in effect a second payment of the Proposition 108 debt service obligation that had already been paid at least indirectly by diversion of PTA funds in the prior years and (2) the debt service obligation was discharged by payment in the prior years so that the transfer of PTA revenue to offset those payments was not the expenditure of money for "transportation planning and mass transportation" purposes.

The trial court agreed with petitioners that the $409 million transfer to offset *past* debt did not serve any transportation planning or mass transportation purpose. The trial court rejected petitioners claim regarding the $200 million transfer, however, when it rejected all of petitioners' challenges to the revenue transferred to the MTF. The trial court found the Legislature's amendments to section 7102, subdivision (a)(1) were valid, so the $622 million transferred to the MTF was not PTA spillover gas tax revenue subject to section 99310.5. Petitioners appeal the trial court's conclusion with respect to the $200 million transfer and the State cross-appeals the trial court's conclusion with respect to the $409 million transfer.

We have previously concluded that section 7102, subdivision (a)(1)(G) and (H), were invalid Legislative amendments in light of the voters' intent in enacting Proposition 116. Thus, the two transfers of PTA spillover gas tax revenue for reimbursement of the General Fund for prior debt service payments present the same dispositive issue: does the transfer of spillover gas tax revenue to the General Fund for the purpose of reimbursing the General Fund's past

payment of its obligations on bond issues that were for a mass transportation purpose a transfer that is for a mass transportation purpose?[12] We conclude the answer is no.

There is a clear distinction between transferring revenue from the PTA to the General Fund to pay *current* debt obligations on mass transportation bonds and transferring such revenue to reimburse for *past* debt obligations. In the case of the former, the revenue flows from the source to the present obligation via the General Fund to serve a mass transportation purpose. Although the money passes through the General Fund, it is still actually being used for the identified mass transportation purpose. In the Legislature's discretion, this may include the payment of current bond debt on mass transportation bonds. In the case of offsets or reimbursement of past debt service payments, however, there is no mass transportation debt obligation to be paid with the PTA funds. The debt was paid by the General Fund in the prior fiscal years. No actual debt remains. Money from the PTA under the label of offsetting or reimbursing past debt payments is simply transferred to the General Fund where it can be used for any governmental purpose. Such reimbursement of the General Fund for its previous payment of its obligation on the specified bonds does not serve a "mass transportation" purpose. There is no flowthrough similar to the payment of current debt. "Funding restrictions cannot be ignored through the guise of a theoretical legal 'obligation.' " (*PE v. Wilson, supra*, 61 Cal.App.4th 1013, 1021.)

The State offers a cursory argument that the reimbursement of past debt service payments does serve a mass transportation function. The State suggests there is a mass transportation purpose in the reimbursements because they provide needed flexibility for the Legislature to deal with mass transportation projects supported with spillover gas tax revenues that vary from year to year. The State reasons that "[i]f the Legislature did not have the flexibility to reimburse the General Fund for prior debt service payments, it would be forced to use spillover revenues to make current debt service payments even when there was a minimal amount of spillover revenues available to be transferred into the PTA. By allowing the Legislature to reimburse the General Fund for past debt service payments, it would be able to make such payments when spillover revenues are high such that transportation projects ordinarily serviced by the PTA would not be impacted."

---

[12] The State's briefs largely ignore the issue of whether the transfer of PTA funds to the General Fund for the purpose of offsetting or reimbursing past debt payments is a mass transportation purpose under section 99310.5. Somehow the State sees petitioner's "only argument" regarding these transfers to be petitioners' first argument that the transfers are in effect a second payment of the Proposition 108 debt service obligation that has already been paid at least indirectly by diversion of PTA funds in the prior years. Like the trial court, we do not need to reach such issue because we agree with petitioners' second argument that the reimbursement of past debt paid is not a "mass transportation" purpose.

 We reject this argument for two reasons. First, the petitioners note that the State's argument does not square with legislative practice: General Fund revenues were used to pay debt service in years when there was ample PTA revenue. Second, the argument is beside the point. Constitutional restrictions cannot be ignored based on budgetary convenience.

D. *Payment of Suspended Transfer Reimbursements As a Mass Transportation Purpose*

The Legislature authorized the transfer of $83 million from the MTF to the General Fund in the 2007–2008 budget year for the purpose of making suspended transfer reimbursements required by Article XIX B, section 1, subdivision (f). (§ 7103, subd. (b).) The trial court determined no law prohibited the reimbursement of the General Fund for its ultimate obligation to repay the suspended transfers and rejected petitioners' challenge to the appropriation, citing *PE v. Wilson, supra,* 61 Cal.App.4th at pages 1020–1021. Petitioners contend the trial court erred in finding *PE v. Wilson* applicable and in concluding the transfer did not violate Proposition 116 and Article XIX B, section 1, subdivision (f). The State claims *PE v. Wilson* controls the outcome of petitioners' challenge and requires us to uphold this transfer.

In *PE v. Wilson, supra,* 61 Cal.App.4th 1013, this court concluded the Legislature could use funds from the State Highway Account (SHA) to reimburse the General Fund for payments of principal and interest on Proposition 108 and Proposition 116 bonds, except to the extent the SHA funds were traceable to "gas tax" funds that were transferred in violation of article XIX, section 4 of the California Constitution. (*PE v. Wilson, supra,* at p. 1017.) We drew a distinction between "reimbursement" and "obligation" and held that the use of SHA funds to reimburse the General Fund was not prohibited by Proposition 108 and Proposition 116, which placed the ultimate obligation for payment of the bonds on the General Fund. (*PE v. Wilson, supra,* at pp. 1020–1021.) We rejected appellants' argument that the reimbursement violated the intent of the voters to increase mass transit spending without depleting existing *transportation* funds such as the SHA. (*Id.* at pp. 1022–1023.) Instead, from the statement of intent set forth in section 99611, we found "the voters intended to increase mass transit spending without depleting or displacing any existing *public transportation* (mass transit) funds. Indeed, section 99611 provides that public transit funding should be increased from existing transportation funds like fuel taxes and sales taxes on fuels." (*PE v. Wilson, supra,* at p. 1022.) We found there was "no evidence that SHA funds or other transportation funds already earmarked for mass transit have been directed to the General Fund for this bond debt reimbursement." (*Id.* at p. 1023.)

■ From *PE v. Wilson, supra*, 61 Cal.App.4th 1013, we draw several useful principles applicable here. First, reimbursement of the General Fund for its payment of debt is not precluded simply because the debt obligation is imposed in the first place on the General Fund. (*Id.* at pp. 1020–1021.) However, careful analysis must be made of both the purpose of the reimbursement and the revenue source for the reimbursement in order to evaluate the validity of the reimbursement. The reimbursement was valid in *PE v. Wilson* even though the money was being used to reimburse, in part, payment of Proposition 116 bond debt because the revenue source, the SHA, was a general transportation account with no evidence the money came from funds already earmarked in the SHA for mass transportation purposes. (61 Cal.App.4th at pp. 1022–1023.)

■ In contrast here, the revenue source for the reimbursement of the General Fund for its obligation to repay suspended transfers of nonspillover gas tax revenue is spillover gas tax revenue that should have been deposited in the PTA. Such revenue is burdened with the restriction of section 99310.5 that it be used for transportation planning and mass transportation purposes. The purpose of the reimbursement is to pay back the General Fund for its payment of suspended transfer reimbursements required under Article XIX B, section 1, subdivision (f). Like the reimbursement of the General Fund for other payments of current debt, this reimbursement essentially flows through the General Fund to the Transportation Investment Fund to replace nonspillover gas tax revenues that should have been transferred to that fund in 2003–2004 and 2004–2005. Thus, spillover gas tax revenue earmarked for transportation planning and mass transportation purposes is being transferred to the Transportation Investment Fund for use in accordance with the directives found in Article XIX B. Article XIX B allocates specific amounts and percentages of the revenue in the Transportation Investment Fund to state and local entities for street and highway maintenance, general transportation and public/mass transportation purposes. (Art. XIX B, § 1, subd. (b); Rev. & Tax. Code, former § 7104, as amended by Stats. 2001, ch. 113, § 9.) Thus, its purposes are not limited to transportation planning and mass transportation. Therefore, the use of PTA spillover gas tax revenues to fund the Transportation Investment Fund (through suspended transfer reimbursements) violates Proposition 116. (§ 99310.5.) This conclusion is consistent with the reasoning of *PE v. Wilson, supra*, 61 Cal.App.4th 1013.

Given our conclusion that the transfer from the MTF of PTA spillover gas tax revenue to the General Fund for suspended transfer reimbursements violates Proposition 116, we need not consider petitioners' claim that it also violates the voters' intent in passing Proposition 1A, which amended Article XIX B.

## III.

### Payment of Current Proposition 116 Debt with PTA Revenue

As we have stated before, in adopting Proposition 116 the voters expressed their intent that the "bond funds shall not be used to displace existing sources of funds for rail and other forms of public transportation, including, but not limited to, funds that have been provided pursuant to . . . the [PTA] . . . ; and that funding for public transit should be increased from existing sources including fuel taxes and sales tax on fuels." (§ 99611.) Petitioners claim the payment in the 2007–2008 budget year of $124 million current Proposition 116 debt with funds that should have been deposited in the PTA account is a displacement or decrease of existing sources of funds and so violates Proposition 116. We agree.

The trial court's conclusion to the contrary was predicated on its earlier decision that the Legislature's amendment of section 7102, subdivision (a)(1), was valid and that the funds in the MTF were not PTA spillover gas tax revenue to which section 99611 was applicable. We have rejected that predicate. The 2007–2008 budget appropriation from the MTF of PTA spillover gas tax revenue to pay current Proposition 116 debt in effect displaced or decreased an existing source of funds for public transportation, the PTA. The appropriation violates section 99611.

The State, however, contends this construction of section 99611 renders the section unconstitutional. Citing *People's Advocate, Inc. v. Superior Court* (1986) 181 Cal.App.3d 316, 328 [226 Cal.Rptr. 640] (*People's Advocate*), the State argues our interpretation of section 99611 "runs afoul of the principle that no statute, including an initiative statute, may bind the hands of future Legislatures by adopting rules not capable of change." Again relying on *People's Advocate* (181 Cal.App.3d at p. 329), the State argues our interpretation of section 99611 restrains the ability of the Legislature to budget funds in a particular year in the manner it sees fit, dictates the content of future budget bills, and circumvents the budget process called for by the California Constitution. We disagree.

In *People's Advocate, supra*, 181 Cal.App.3d at pages 328–329, this court invalidated, inter alia, a portion of the Legislative Reform Act of 1983, a statutory initiative, which limited the amount of monies that the Legislature could appropriate for its own support. We found the limitation, which was based on a formula tied to the budget bill enacted for the budget year

1982–1983, violated the established principles that legislative enactments may not be used to divest the Legislature of the power to enact legislation within its competence and that the Legislature may not bind its own hands or those of future Legislatures by rules that are not capable of change. (181 Cal.App.3d at p. 328.) The people's initiative power was circumscribed by the same principles. (*Ibid.*) We also concluded the limitation violated article IV, section 12 of the California Constitution because it "invade[d] not only the *content* of the Governor's budget bill but displace[d] the process (budget and budget bill) by which [the constitution] commands the adoption and enforcement of the budget." (181 Cal.App.3d at p. 329.)

However, we noted significantly that the limitation at issue "must be distinguished from the constitutional authorization to appropriate money by statute by measures other than the budget bill. That power is specifically recognized in article IV, section 12. It authorizes the Legislature and hence the people to provide by statute for a continuing appropriation to pay for some specified program. (See, e.g., *Railroad Commission* v. *Riley* (1923) 192 Cal. 54 [218 P. 415].) However, the power so recognized does not authorize the placement of a *legal* limit upon the power of the Legislature to enact future appropriations legislation. [¶] Although as a practical fiscal matter, a statute containing a continuous appropriation may limit the Legislature's *financial choices* in other appropriations measures, such a limitation is not one imposed by *law*." (*People's Advocate, supra,* 181 Cal.App.3d at p. 329, fn. 13.)

The voters in adopting Proposition 116 directed, through the statement of intent contained in section 99611, that the proposition's bond funds should be an additional funding source for primarily rail transportation on top of other existing sources of funding for public transportation. The voters specified that all of the bond funds authorized by Proposition 116 are continuously appropriated[13] for allocation for grants to support the proposition's purposes. (Pub. Util. Code, §§ 99612, 99613.) As a continuous appropriation, the limitation imposed by section 99611 on the use of Proposition 116 bond funds is distinguishable from the limitation we invalidated in *People's Advocate.* (*People's Advocate, supra,* 181 Cal.App.3d at p. 329, fn. 13.) The limitation does not run afoul of article IV, section 12, of the California Constitution.

---

[13] " 'A continuous [or continuing] appropriation runs from year to year *without the need for further authorization in the budget act.* [Citations.]' (Fn. omitted, italics added.)" (*White v. Davis* (2003) 30 Cal.4th 528, 538 [133 Cal.Rptr.2d 648, 68 P.3d 74], quoting *California Assn. for Safety Education v. Brown* (1994) 30 Cal.App.4th 1264, 1282 [36 Cal.Rptr.2d 404].)

Moreover, since the limitation contained in section 99611 may be amended by legislative statutory initiative or by referendum, it is capable of change and the people and Legislature are not divested of authority to enact future legislation. (See *Watson v. Fair Political Practices Com.* (1990) 217 Cal.App.3d 1059, 1071–1072 [266 Cal.Rptr. 408].)

## IV.

## Conclusion Summary

■ We conclude the Legislature's amendment of section 7102, subdivision (a)(1) to add subparts (G) and (H) is not consistent with and does not further the purpose of section 7102, subdivision (a)(1) and, therefore, is invalid. The funds transferred pursuant to those subparts are still PTA spillover gas tax revenue restricted in use to the purposes of transportation planning and mass transportation pursuant to section 99310.5. We conclude the voters intended the term "mass transportation" used in section 99310.5 to mean public transportation or public transit.

Applying these conclusions to the Legislature's appropriations of PTA spillover gas tax revenue for the 2007–2008 budget year, we conclude (1) the Legislature's appropriation of $144,332,489 for the payment of current debt service on Proposition 192 bonds is invalid as it does not serve a transportation planning or mass transportation purpose; (2) the Legislature's appropriation of $99,120,000 to the Department of Education for the Home-to-School and Small School District Transportation programs is invalid for the same reason; (3) the Legislature's appropriation of $128,806,000 to the State Department of Developmental Services for transportation of the developmentally disabled to regional centers is invalid for the same reason; (4) the Legislature's appropriation of $200 million for reimbursement of past debt service of Proposition 108 bonds is invalid for the same reason; (5) the Legislature's appropriation of $409 million for reimbursement of past debt service of Proposition 108 bonds is invalid for the same reason; (6) the Legislature's appropriation of $82,678,000 for the purpose of making suspended transfer reimbursements required by Article XIX B, section 1, subdivision (f), is invalid for the same reason; and (7) the Legislature's appropriation of $123,973,493 for payment of current debt service on Proposition 116 bonds is invalid as it violates section 99611.

## DISPOSITION

The portion of the judgment granting a declaratory judgment and writ of mandate regarding the budget year 2007–2008 transfer of $409 million is affirmed. The portion of the judgment denying all other relief is reversed. The trial court is directed to enter a new judgment granting declaratory relief and a writ of mandate consistent with this opinion. Costs on appeal are awarded to Josh Shaw and the California Transit Association. (Cal. Rules of Court, rule 8.278(a).)

Nicholson, Acting P. J., and Raye, J., concurred.

The petition of defendants and appellants for review by the Supreme Court was denied September 30, 2009, S175357.

## Appendix A

## Retail Sales Tax Fund
## $1,258,893,348 in Spillover Revenue