Filed 4/2/19; On transfer

<u>CERTIFIED</u> <u>FOR</u> <u>PUBLICATION</u>

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| NATIONAL ASIAN AMERICAN COALITION et al., | C079835 |
| Plaintiffs and Appellants, | (Super. Ct. No. 34201480001784CUWMGDS) |
| v. | |
| GAVIN C. NEWSOM, as Governor, etc., et al., | OPINION ON TRANSFER |
| Defendants and Appellants. | |

APPEAL from a judgment of the Superior Court of Sacramento County, Timothy M. Frawley, Judge. Reversed in part and remanded with directions.

REMCHO, JOHANSEN & PERCEL, Robin B. Johansen and Margaret R. Prinzing for Gavin C. Newsom, as Governor, and Keely Bosler, Director of Finance; Office of the State Controller, Richard J. Chivaro, Ronald V. Placet and David I. Brownfield for Betty T. Yee, Controller, Defendants and Appellants.

JENNER & BLOCK, Rick Richmond, L. David Russell, Jeffrey A. Atteberry, Alexander M. Smith, Neil M. Barofsky (admitted *pro hac vice*), Jessica Ring Amunson (admitted *pro hac vice*), Ava U. McAlpin (to apply *pro hac vice*) and Robert L. Gnaizda for Plaintiffs and Appellants.

1

This appeal arises out of the subprime mortgage crisis, a nationwide banking emergency that began in 2007 with the collapse of a housing financing bubble created in large part by an increase in housing speculation and subprime lending practices. This crisis led to a deep recession in the United States and around the globe. California was hit particularly hard. While the recession ended in mid-2009, at least as a definitional matter, persistent high unemployment continued throughout 2012, along with the continuing decline in home values, increase in foreclosures and personal bankruptcies, and the concomitant decrease in state revenue.

In March 2012, the federal government and the attorneys general of 49 states and the District of Columbia (every state except Oklahoma) brought suit in federal court against the nation's five largest mortgage servicers, i.e., Ally (formerly GMAC), Bank of America, Citigroup, J.P. Morgan Chase, and Wells Fargo (collectively, Bank defendants), alleging a number of violations of federal law. The case was resolved by settlement agreement (the National Mortgage Settlement or NMS), the terms of which the federal court formally entered as consent judgments in April 2012. In addition to setting comprehensive new mortgage servicing standards and providing more than $20 billion in financial relief for homeowners damaged by the mortgage crisis, the NMS also provided for about $2.5 billion to be paid to the states directly, "which sum shall be distributed in the manner and for the purposes specified in Exhibit B" to the agreement. Exhibit B states that "[e]ach State Attorney General shall designate the uses of the funds" and requires, "[t]o the extent practicable, such funds shall be used for purposes intended to avoid preventable foreclosures, to ameliorate the effects of the foreclosure crisis, to enhance law enforcement efforts to prevent and prosecute financial fraud, or unfair or deceptive acts or practices and to compensate the States for costs resulting from the alleged unlawful conduct of [the Bank defendants]."

California's share of this $2.5 billion direct payment was about $410 million.  In Exhibit B-2 to the NMS, former Attorney General Kamala Harris provided fairly detailed instructions as to how these funds should be used.  We describe these instructions later in the opinion.

After the consent judgments were entered, the Legislature enacted Government Code[1] section 12531, creating a special deposit fund in the treasury (the National Mortgage Special Deposit Fund) where 90 percent of the $410 million amount would be deposited.[2]  (§ 12531, subds. (b), (d).)  The Legislature provided, "all moneys in the [National Mortgage Special Deposit Fund] are hereby continuously appropriated, and shall be allocated by the Department of Finance" (*id*., subd. (b)), and further provided: "Notwithstanding any other law, the Director of Finance may allocate or otherwise use the funds in the National Mortgage Special Deposit Fund to offset General Fund expenditures in the 2011-12, 2012-13, and 2013-14 fiscal years."  (*Id*., subd. (e).)  While the Legislature did not specify which General Fund expenditures may be offset using the National Mortgage Special Deposit Fund, subdivision (f) required the Department of Finance to "submit an expenditure plan to the Joint Legislative Budget Committee detailing the proposed use of the moneys in the National Mortgage Special Deposit Fund" at least "30 days prior to allocating moneys pursuant to subdivision (e)."  (*Id*., subd. (f).)

---

[1]	Undesignated statutory references are to the Government Code.

[2]	As we explain in greater detail later, in accordance with former Attorney General Harris's instructions, 10 percent of the direct payment amount would be "paid as a civil penalty and deposited in the Unfair Competition Law Fund."  (See § 12531, subd. (c) ["payments made to the State of California as civil penalties pursuant to the National Mortgage Settlement shall be deposited in the Unfair Competition Law Fund as required by the settlement"].)

Pursuant to this procedure, the director of finance received approval for various expenditures from the National Mortgage Special Deposit Fund "to offset General Fund costs of programs that support public protection, consumer fraud enforcement and litigation, and housing related programs" during the specified fiscal years. We set forth the details of these expenditures later in the opinion. For present purposes, we note they nearly exhausted the National Mortgage Special Deposit Fund.

In March 2014, the National Asian American Coalition, COR Community Development Corporation, and the National Hispanic Christian Leadership Conference filed a petition for writ of mandate and complaint for declaratory and injunctive relief against the Governor, the director of finance, and the controller, seeking the immediate return of approximately $350 million they alleged was unlawfully diverted from the National Mortgage Special Deposit Fund to the General Fund in contravention of both section 12531 and the federal consent judgments.[3]

The trial court concluded section 12531 was intended to effectuate the terms of the federal consent judgments, which required compliance with the instructions provided by former Attorney General Harris in Exhibit B-2 to the National Mortgage Settlement designating the permissible uses of the $410 million direct payment. Rejecting defendants' contention subdivision (e) of that section permitted the director of finance to use the National Mortgage Special Deposit Fund to offset General Fund expenditures

---

[3] Organizational plaintiffs are California-based charitable organizations that either provide counseling to homeowners seeking to avoid foreclosure or stand ready to do so should funding become available through replenishment of the National Mortgage Special Deposit Fund.

Since both parties appealed from the trial court's judgment, we refer to National Asian American Coalition et al. as plaintiffs and Gavin C. Newsom (successor to Edmund G. Brown, Jr., as Governor) et al. as defendants.

regardless of whether such offsets were consistent with these instructions, the trial court reasoned such a reading of the statute would "raise serious doubts about the legality of the statute, not only as to whether the Legislature may override a federal judgment, but also whether the Legislature constitutionally may delegate to an agency the authority to decide how millions of dollars of state funds shall be spent with virtually no guidance or direction from the Legislature." Turning to the question of whether the particular offsets were consistent with the former Attorney General's instructions, the trial court concluded $331,044,084 was unlawfully appropriated from the National Mortgage Special Deposit Fund for purposes inconsistent with these instructions. Nevertheless, pointing out that it lacked the constitutional authority to order the Legislature to appropriate funds, the trial court declared an obligation to restore the unlawfully diverted funds and ordered such restoration "as soon as there is a sufficient appropriation 'reasonably' and 'generally' available for such purpose."

These appeals followed. Defendants contend: (1) plaintiffs lack standing to seek a writ of mandate directing the National Mortgage Special Deposit Fund to be reimbursed for the challenged expenditures; (2) section 12531 does not restrict the director of finance's ability to use the National Mortgage Special Deposit Fund to offset General Fund expenditures, aside from requiring Legislative approval of such offsets; (3) the Legislature possessed absolute authority to approve the challenged expenditures regardless of whether they were consistent with the federal consent judgments; and (4) even if section 12531 required consistency with the federal consent judgments, the challenged expenditures were consistent with both the purposes of the direct payment set forth in Exhibit B to the National Mortgage Settlement and the former Attorney General's instructions set forth in Exhibit B-2. Plaintiffs dispute each of these contentions and, in their appeal, contend: (1) the amount unlawfully diverted from the National Mortgage Special Deposit Fund was actually $350 million; and (2) the trial

5

court erred in concluding separation of powers principles prevented it from ordering the immediate restoration of the unlawfully diverted funds.

On July 10, 2018, we issued an opinion concluding plaintiffs have public interest standing to seek the requested writ of mandate. We also concluded, as did the trial court, section 12531 was intended by our Legislature to effectuate the terms of the National Mortgage Settlement, including the former Attorney General's instructions regarding the proper uses of the money, and over $331 million was unlawfully appropriated from the National Mortgage Special Deposit Fund for purposes inconsistent with the NMS. We parted ways with the trial court, however, on the issue of remedy. As we explained, because the unlawfully diverted funds are "in law still in the [National Mortgage Special Deposit Fund]" (*Daugherty v. Riley* (1934) 1 Cal.2d 298, 312 (*Daugherty*), separation of powers principles do not preclude this court from ordering the immediate return of these funds. We accordingly reversed the judgment in part and remanded the matter to the trial court with directions to issue a writ of mandate directing the immediate retransfer from the General Fund to the National Mortgage Special Deposit Fund the sum of $331,044,084.

After we issued our original opinion in this case, defendants petitioned our Supreme Court for review. While that petition was pending, the Legislature passed and the Governor signed into law Senate Bill No. 861 (2017 – 2018 Reg. Sess.) (Stats. 2018, ch. 331 (SB 861)), amending section 12531 to add subdivision (h), the text of which we provide in its entirety later in this opinion. For present purposes, we note SB 861 states in uncodified section 2: "It is the intent of the Legislature in [adding subdivision (h) to section 12531] to confirm that allocations and uses of funds made by the director of finance from the National Mortgage Special Deposit Fund pursuant to [section 12531] in the 2011-12, 2012-13, and 2013-14 fiscal years were consistent with legislative direction and intent and to abrogate the holding of the Court of Appeal in [this case]. The

Legislature further declares that the allocations made by the director of finance pursuant to [section 12531] were made for purposes consistent with the National Mortgage Settlement." (Stats. 2018, ch. 331, § 2, subd. (a).)

Thereafter, on October 10, 2018, our Supreme Court granted the petition for review and transferred the matter to this court with directions to vacate our original opinion and reconsider the matter in light of this new statutory enactment. Having done so, and giving SB 861 all due consideration, we confirm the conclusions reached in our original opinion.[4]

ADDITIONAL BACKGROUND

Having already provided a description of the events giving rise to this appeal in order to provide context for the parties' contentions and our resolution thereof, we shall not repeat ourselves here. Rather, we elaborate on those portions of context deliberately omitted above. Specifically, we shall provide (1) a fuller description of the terms of the NMS, including the former Attorney General's instructions for use of the $410 million direct payment amount, (2) the complete text of section 12531, as originally enacted, creating the National Mortgage Special Deposit Fund and authorizing disbursements to offset General Fund expenditures, (3) the details of the challenged disbursements made from the National Mortgage Special Deposit Fund, and (4) the Legislature's amendment to section 12531 expressing its view that these disbursements were consistent with both the legislative intent and the National Mortgage Settlement.

### *The National Mortgage Settlement*

The stated purpose of the NMS "is to remediate harms allegedly resulting from the alleged unlawful conduct of the [Bank defendants]." The portion of the NMS relevant to

---

[4]    The request for judicial notice filed by defendants on December 7, 2018 is granted.

7

these appeals provided for about $2.5 billion to be paid directly to the states. As mentioned, the agreement provided this amount "shall be distributed in the manner and for the purposes specified in Exhibit B."

Paragraph 1 of Exhibit B provides in relevant part:

"b.    *State Payment Settlement Amounts*.  In accordance with written instructions from each State Attorney General, the Escrow Agent shall distribute cash payments in the total amounts set forth in the attached Exhibit B-1.[5]

"i.    Each State Attorney General shall designate the uses of the funds set forth in the attached Exhibit B-1.  To the extent practicable, such funds shall be used for purposes intended to avoid preventable foreclosures, to ameliorate the effects of the foreclosure crisis, to enhance law enforcement efforts to prevent and prosecute financial fraud, or unfair or deceptive acts or practices and to compensate the States for costs resulting from the alleged unlawful conduct of [the Bank defendants].  Such permissible purposes for allocation of the funds include, but are not limited to, supplementing the amounts paid to state homeowners under the Borrower Payment Fund,[6] funding for housing counselors, state and local foreclosure assistance hotlines, state and local foreclosure mediation programs, legal assistance, housing remediation and anti-blight projects, funding for training and staffing of financial fraud or consumer protection enforcement efforts, and civil penalties.  Accordingly, each Attorney General has set forth general instructions for the funds in the attached Exhibit B-2.

---

[5]    Exhibit B-1 lists California's share of the state payment settlement amount as $410,576,996.

[6]    As mentioned, the vast majority of damages paid by the Bank defendants under the NMS, more than $20 billion, was designated to provide financial relief for individual borrowers.  Exhibit C to the NMS set forth the details regarding administration of the distribution of cash payments to such borrowers.

"ii.    No more than ten percent of the aggregate amount paid to the State Parties under this paragraph 1(b) may be designated as a civil penalty, fine, or similar payment. The remainder of the payment[] is intended to remediate the harms to the States and their communities resulting from the alleged unlawful conduct of the [Bank defendants] and to facilitate the implementation of the Borrower Payment Fund and consumer relief."

In Exhibit B-2, former Attorney General Harris provided the following general instructions:

"a)    Ten percent of the payment shall be paid as a civil penalty and deposited in the Unfair Competition Law Fund;

"b)    The remainder shall be paid and deposited into a Special Deposit Fund created for the following purposes: for the administration of the terms of this Consent Judgment; monitoring compliance with the terms of this Consent Judgment and enforcing the terms of this Consent Judgment; assisting in the implementation of the relief programs and servicing standards as described in this Consent Judgment; supporting the Attorney General's continuing investigation into misconduct in the origination, servicing, and securitization of residential mortgage loans; to fund consumer fraud education, investigations, enforcement operations, litigation, public protection and/or local consumer aid; to provide borrower relief; to fund grant programs to assist housing counselors or other legal aid agencies that represent homeowners, former homeowners, or renters in housing-related matters; to fund other matters, including grant programs, for the benefit of California homeowners affected by the mortgage/foreclosure crisis; or to engage and pay for third parties to develop or administer any of the programs or efforts described above."

### Creation of the National Mortgage Special Deposit Fund

After the federal court approved the National Mortgage Settlement and entered consent judgments incorporating its terms, the department of finance submitted a letter

(Finance letter) to the Senate Budget and Fiscal Review Committee requesting, among other things, trailer bill language authorizing "the Director of Finance to allocate funds received pursuant to the [NMS]" and creating a special fund where these settlement funds would be deposited. The Finance letter states: "For 2011-12 and 2012-13, $94.2 million of the [direct payment amount] will be used to offset General Fund costs of programs that support public protection, consumer fraud enforcement and litigation, and housing related programs. An additional $198 million will be used for debt service payments for programs funded with Proposition 46 and Proposition 1C housing bonds that assist homeowners. The remaining $118.4 million will be reserved for similar use in 2013-14."[7]

About six weeks later, the Legislature enacted section 12531 as part of a trailer bill to the 2012 Budget Act. At the time of its enactment, this section provided in full:

"(a) The Legislature finds and declares that California, represented by the California Attorney General, entered a national multistate settlement with the country's five largest loan servicers. This agreement, the National Mortgage Settlement stemmed from successful resolution of federal court action (Consent Judgment, United States v. Bank of America (No. 1:12-cv-00361, Banzr. D.C. Apr. 4, 2012). The National

---

[7]    Defendants ask this court to take judicial notice of the State Department of Housing and Community Development's record of Proposition 1C bond awards through December 31, 2013, explaining this government document was before the trial court and is part of the record on appeal, but the copy therein is "corrupt and illegible." Plaintiffs do not oppose this request, which we grant. (Evid. Code, § 452, subds. (c), (h).) We deny defendants' further request that we take judicial notice of a motion to vacate judgment and trial court order denying that motion in another case, *Shaw v. Chiang*, Sacramento County Superior Court Case No. 07CS01179. These materials are irrelevant to our resolution of the issues raised in this appeal. (See *Towns v. Davidson* (2007) 147 Cal.App.4th 461, 473, fn. 3 [declining to take judicial notice of irrelevant filings in another appeal].)

10

Mortgage Settlement is broad ranging, with California's share of this settlement estimated to be up to eighteen billion dollars ($18,000,000,000). Of this amount, approximately four hundred ten million dollars ($410,000,000) will come directly to the state in costs, fees, and penalty payments.

"(b)    There is hereby created in the State Treasury the National Mortgage Special Deposit Fund. Notwithstanding Section 13340, all moneys in the fund are hereby continuously appropriated, and shall be allocated by the Department of Finance.

"(c)    Direct payments made to the State of California as civil penalties pursuant to the National Mortgage Settlement shall be deposited in the Unfair Competition Law Fund as required by the settlement.

"(d)    Direct payments made to the State of California pursuant to the National Mortgage Settlement, except for those payments made pursuant to subdivision (c), shall be deposited in the National Mortgage Special Deposit Fund.

"(e)    Notwithstanding any other law, the Director of Finance may allocate or otherwise use the funds in the National Mortgage Special Deposit Fund to offset General Fund expenditures in the 2011-12, 2012-13, and 2013-14 fiscal years. The Department of Finance and the Controller's office shall recognize this fiscal alignment accordingly for the purpose of the state budget process and legal basis of accounting.

"(f)    Not less than 30 days prior to allocating any moneys pursuant to subdivision (e), the Department of Finance shall submit an expenditure plan to the Joint Legislative Budget Committee detailing the proposed use of the moneys in the National Mortgage Special Deposit Fund.

11

"(g)    Notwithstanding any other law, the Controller may use the funds in the National Mortgage Special Deposit Fund for cashflow loans to the General Fund as provided in Sections 16310 and 16381."  (§ 12531.)

### *Disbursements from the National Mortgage Special Deposit Fund*

About two months after the National Mortgage Special Deposit Fund was created, the escrow agent wired the entirety of California's direct payment into the state's Litigation Deposits Fund.  Thereafter, pursuant to section 12531, 10 percent of that amount was redirected into the Unfair Competition Law Fund and 90 percent was redirected into the National Mortgage Special Deposit Fund.

Before setting forth the details of the challenged disbursements, we briefly note those that are not challenged.  Consistent with section 12531, subdivision (g), the 2012 Budget Act authorized a $100 million loan from the National Mortgage Special Deposit Fund to the General Fund to be repaid by June 30, 2014.  Such a loan was made on September 24, 2012 and repaid with interest on April 11, 2014.  The 2012 Budget Act also appropriated about $18 million from the National Mortgage Special Deposit Fund to the State Department of Justice, $8 million of which was appropriated to support the Office of the California Monitor, who assists the Attorney General in ensuring the Bank defendants comply with the terms of the NMS, and the remaining $10 million was appropriated for grants to assist homeowners affected by the foreclosure crisis.  These disbursements are clearly consistent with the former Attorney General's general instructions for use of the funds and are not challenged in these appeals.

The challenged disbursements total about $350 million.  The expenditure plan submitted by the Department of Finance pursuant to section 12531, subdivision (f), proposed the following offsets:

12

"General Fund debt service payments for Propositions 1C and 46 Housing Bonds will be offset by [$292.4 million, i.e.,] $106 million, $92 million, and $94.4 million in 2011-12, 2012-13, and 2013-14[,] respectively."

"The Department of Justice's (DOJ's) General Fund expenditures will be offset by [$49.2 million, i.e.,] $14.9 million, $17.8 million, and $16.5 million in 2011-12, 2012-13, and 2013-14[,] respectively."

"The Department of Fair Employment and Housing's General Fund expenditures will be offset by [$9 million, i.e.,] $3 million in 2011-12, 2012-13, and 2013-14[,] respectively."

While the department of finance did not receive a response to this expenditure plan, that department's Final Change Book for the 2012-13 Budget indicates the Legislature accepted the request made in the Finance letter that preceded enactment of section 12531, i.e., that the direct payment would be used to offset General Fund costs of programs that support public protection, consumer fraud enforcement and litigation, and housing related programs. Various executive orders executed the offsets proposed in the expenditure plan, with minor alterations to the amounts.[8]

### 2018 Amendment to Section 12531

After we issued our original opinion concluding the vast majority of these challenged disbursements (over $331 million) were unlawful, the Legislature enacted SB 861, effective September 10, 2018, amending section 12531 to add subdivision (h). This subdivision provides: "The Legislature hereby confirms and ratifies that the allocations of funds from the National Mortgage Special Deposit Fund in the 2011-12,

---

[8] For example, whereas $94.4 million was proposed for offsetting General Fund debt service payments for Propositions 1C and 46 housing bonds in the 2013-14 fiscal year, the amount transferred for these purposes was actually $94.7 million. The precise total amount of challenged transfers is $350,360,084.

13

2012-13, and 2013-14 fiscal years were consistent with the direction given to the Director of Finance in subdivision (e) to offset General Fund expenditures in those years. The Legislature further confirms and ratifies that because those allocations were displayed in the Governor's proposed budget for the 2012-13 and 2013-14 fiscal years, and left unchanged in the budget acts adopted for the 2012-13 and 2013-14 fiscal years, the Legislature was aware of, and approved, the allocation and expenditure of funds from the National Mortgage Special Deposit Fund to offset General Fund expenditures in those fiscal years. This subdivision is declaratory of existing law." (§ 12531, subd. (h); Stats. 2018, ch. 331, § 3.)

SB 861 states in uncodified section 2: "It is the intent of the Legislature in [adding subdivision (h) to section 12531] to confirm that allocations and uses of funds made by the Director of Finance from the National Mortgage Special Deposit Fund pursuant to [section 12531] in the 2011-12, 2012-13, and 2013-14 fiscal years were consistent with legislative direction and intent and to abrogate the holding of the Court of Appeal in [this case]. The Legislature further declares that the allocations made by the Director of Finance pursuant to [section 12531] were made for purposes consistent with the National Mortgage Settlement." (Stats. 2018, ch. 331, § 2, subd. (a).)

We finally note the Legislature declared in uncodified section 1 various ways in which it has provided funding and encouragement for affordable housing "in the past several years." (Stats. 2018, ch. 331, § 1, subd. (a).)[9]

---

[9] This section provides in full: "The Legislature hereby finds and declares the following:

"(a) The state has funded and allocated billions of dollars for affordable housing in the past several years.

"(b) The 2018–19 budget alone includes $5.1 billion in state and federal funds across multiple programs and departments to address housing and homelessness.

14

"(c) The Governor and Legislature developed a legislative package of 15 bills signed in September 2017 that collectively shorten the housing development approval process, provide incentives to streamline development, promote local accountability to adequately plan for needed housing, and invest in affordable housing production.  The housing package establishes a $75 document recording fee on real estate transactions, excluding home sales, beginning January 1, 2018, to create a sustainable funding source for state affordable housing programs.

"(d) The 2017 legislative package also places a $4 billion bond on the November 2018 ballot, with $3 billion in general obligation bonds for affordable housing, and $1 billion for veterans housing to be supported by participants' loan repayments.

"(e) To encourage housing development, the Legislature provided local governments with tools to help fulfill their housing priorities and responsibilities, including:

"(1) Chapter 386, Statutes of 2013 (SB 743), which provides an alternative approach for CEQA analysis of transportation impacts of transit-oriented development and new exemptions for certain projects.

"(2) Chapter 785, Statutes of 2014 (SB 628), which allows cities and counties to create an enhanced infrastructure financing district that utilizes property taxes and other available funding for various types of projects including low and moderate income housing projects.

"(3) Chapter 319, Statutes of 2015 (AB 2), which allows specified disadvantaged areas of California to create a community revitalization and investment authority that utilizes property taxes and other available funding for various types of projects, including affordable housing.

"(4) Various statutes that reduce minimum parking requirements and expand size and other bonuses for developers that meet affordability requirements.

"(5) Chapters 720 and 735, Statutes of 2016 (SB 1069 and AB 2299), which streamline permits and require local ordinances to facilitate the development of these low-cost housing options that provide additional living quarters on single-family lots that are independent of the primary dwelling unit.

"(6) Chapter 453, Statutes of 2016 (AB 2031), allows a local government, with an existing successor agency to a former redevelopment agency, to bond against the property tax revenues it receives as a result of redevelopment agency dissolution for the purposes of affordable housing development.

"(f) In 2016 the Governor signed into law the No Place Like Home Program, which funds the construction of permanent supportive housing targeted to the chronically homeless and those at risk of chronic homelessness with mental health services needs.  The

DISCUSSION

# I

### *Standard of Review*

Plaintiffs sought a writ of mandate from the trial court, as well as declaratory and injunctive relief, compelling defendants to return the $350 million they claim was unlawfully diverted from the National Mortgage Special Deposit Fund. "A writ of mandate 'may be issued by any court . . . to compel the performance of an act which the law specially enjoins, as a duty resulting from an office, trust, or station . . . .' (Code

---

program is funded with a $2 billion bond, secured by Mental Health Services Act (Proposition 63) revenues, and will be on the November 2018 ballot to accelerate the issuance of program funds.

"(g) The Veteran's Housing and Homeless Prevention Bond Act of 2014 (Proposition 41) repurposed $600 million in bond funds to fund multifamily housing for veterans and their families.

"(h) The California Tax Credit Allocation Committee, which administers the low-income housing tax credit program, has made a number of regulatory changes to increase the utilization of this program. Tax credit financing supports nearly all deed-restricted affordable housing in California; improvements to this program benefit low-income families across the state. These efforts resulted in a historic high of 20,847 housing units financed with '4 percent' federal tax credits in 2016.

"(i) In addition, the California Tax Credit Allocation Committee has worked with the California Debt Limit Allocation Committee to convene a High Cost Task Force to address the growing housing development costs that limit the impact of public investment. As a result, the state has set a high-cost threshold for funded projects, provided incentives for the construction of larger projects with lower costs per unit, and removed state funding requirements that prioritize expensive projects.

"(j) The California Housing Financing Agency has increased its multifamily lending activity each year since the Great Recession, providing $369 million in financing in 2016–17 to support 2,100 affordable housing units. The agency also issued $682 million in private activity bonds for affordable housing since 2015.

"(k) The state's first-time homebuyers downpayment assistance program has provided $4 billion to moderate-income families that do not qualify for the low-income programs." (Stats. 2018, ch. 331, § 1.)

16

Civ. Proc., § 1085, subd. (a).)" (*Kavanaugh v. West Sonoma County Union High School Dist.* (2003) 29 Cal.4th 911, 916.) Plaintiffs were required to show a " 'clear, present, and usually ministerial duty' " on the part of defendants to return the allegedly diverted funds, and that plaintiffs have a " 'clear, present and beneficial right . . . to the performance of that duty.' " (*Santa Clara County Counsel Attys. Assn. v. Woodside* (1994) 7 Cal.4th 525, 539-540, superseded by statute on another point as stated in *Coachella Valley Mosquito and Vector Control Dist. v. California Public Employment Relations Bd.* (2005) 35 Cal.4th 1072, 1077.) "A ministerial duty is an act that a public officer is obligated to perform in a prescribed manner required by law when a given state of facts exists." (*Alliance for a Better Downtown Millbrae v. Wade* (2003) 108 Cal.App.4th 123, 129.)

On appeal, we defer to the trial court's factual determinations if supported by substantial evidence. However, as always, we review questions of law de novo. (*Kavanaugh v. West Sonoma County Union High School Dist.*, *supra*, 29 Cal.4th at p. 916.) Here, whether or not the $350 million in question was unlawfully diverted from the National Mortgage Special Deposit Fund turns not on disputed facts, but on the proper interpretation of section 12531 and the National Mortgage Settlement. We therefore "exercise our independent judgment and review the matter de novo." (*Alliance for a Better Downtown Millbrae v. Wade*, *supra*, 108 Cal.App.4th at p. 129; see also *California Medical Ass'n v. Brown* (2011) 193 Cal.App.4th 1449, 1455-1456.)

## II

### *Standing*

Defendants contend plaintiffs "cannot enforce the consent judgments under federal law, and lack standing to bring their claims under California law." While we agree the individual homeowners plaintiffs seek to assist in staying in their homes " 'are merely incidental beneficiaries of the National Mortgage Settlement,' " and therefore

17

have "no standing to enforce the consent judgment[s]" (*Graham v. Bank of America, N.A.* (2014) 226 Cal.App.4th 594, 615-616), this does not mean plaintiffs lack standing to seek a writ of mandate under California law to require defendants to comply with section 12531.

The law governing standing to seek a writ of mandate is well-settled. "As a general rule, a party must be 'beneficially interested' to seek a writ of mandate. (Code Civ. Proc., § 1086.) 'The requirement that a petitioner be "beneficially interested" has been generally interpreted to mean that one may obtain the writ only if the person has some special interest to be served or some particular right to be preserved or protected over and above the interest held in common with the public at large. . . . The beneficial interest must be direct and substantial. [Citations.]' " (*Save the Plastic Bag Coalition v. City of Manhattan Beach* (2011) 52 Cal.4th 155, 165.)

However, " 'where the question is one of public right and the object of the mandamus is to procure the enforcement of a public duty, the [petitioner] need not show that he [or she] has any legal or special interest in the result, since it is sufficient that [the petitioner] is interested as a citizen in having the laws executed and the duty in question enforced.' " (*Board of Social Welfare v. Los Angeles County* (1945) 27 Cal.2d 98, 100-101.) "The exception promotes the policy of guaranteeing citizens the opportunity to ensure that no governmental body impairs or defeats the purpose of legislation establishing a public right" and "has often been invoked by California courts." (*Green v. Obledo* (1981) 29 Cal.3d 126, 144.) As this court has explained: "When the duty is sharp and the public need weighty, the courts will grant a mandamus at the behest of an applicant who shows no greater personal interest than that of a citizen who wants the law enforced." (*McDonald v. Stockton Met. Transit Dist.* (1973) 36 Cal.App.3d 436, 440; see also *Urban Habitat Program v. City of Pleasanton* (2008) 164 Cal.App.4th 1561, 1581.)

18

Here, the trial court concluded plaintiffs did not have beneficial interest standing, explaining they "have no *direct* interest in the legal duty sought to be compelled and will gain no *direct* benefit from its performance." However, the trial court also concluded plaintiffs fell within the "well-established 'public interest' exception to the beneficial interest requirement." Because we agree with the latter conclusion, we need not consider the former.

As we explained in *Shaw v. People ex rel. Chiang* (2009) 175 Cal.App.4th 577 (*Shaw*), "[t]he Legislature has plenary lawmaking authority over the state's budget (Cal. Const., art. IV, § 12) and we are aware of no constitutional prohibition precluding it from creating specific funds in the State Treasury for any number of governmental purposes." (*Id*. at p. 602.) Unless the Legislature clearly conveys a contrary intention, " '[i]t is the policy of the law . . . to have . . . funds authorized for a particular purpose expended for such purpose.' [Citations.]" (*Stanson v. Mott* (1976) 17 Cal.3d 206, 213.) Here, such a fund was created for purposes we describe below, the money deposited therein was continuously appropriated, and the department of finance was tasked with expending the money for those purposes. (§ 12531, subd. (b).) We consider the duty to comply with restrictions placed by our Legislature on the expenditure of public funds to be "sharp." Indeed, as we explain more fully later in this opinion, money misappropriated from a special deposit fund is considered a loan by operation of law and a writ of mandate may issue to direct reimbursement. (See *Daugherty*, *supra*, 1 Cal.2d at pp. 309, 312.) We also consider "weighty" the public need to have such restrictions enforced. Petitioners therefore have standing to challenge the expenditures they claim are inconsistent with section 12531.

Nevertheless, defendants argue, "the public interest exception should not apply" in this case because "the alleged interest is 'outweighed . . . by competing considerations of a more urgent nature,' " and cite this court's decision in *Sacramento County Fire*

19

*Protection Dist. v. Sacramento County Assessment Appeals Bd.* (1999) 75 Cal.App.4th 327 as an example of a situation in which competing considerations prevailed over the public interest sought to be vindicated by issuance of the writ. There, we held a fire protection district, as a property tax recipient, had no standing to seek a writ of mandate challenging an assessment appeals board's valuation of certain property located within the district. With respect to the public interest exception to the beneficial interest requirement, we held the public interest sought to be protected by the district's challenge to the valuation was " 'outweighed . . . by competing considerations of a more urgent nature . . . .' " (*Id*. at p. 334.) As we explained, providing standing to the fire protection district, and inevitably other entities for which the county collects taxes, would create "chaos" in the taxing process. Moreover, denying standing to the fire protection district would not render unreviewable the assessment appeals board's valuation decision because that decision could be challenged by the State Board of Equalization or by a county or city. (*Ibid*.)

Defendants argue, "[s]imilar risks arise here" because providing plaintiffs with standing in this case allows them to "override" provisions in the National Mortgage Settlement that "excluded third-parties like [them] from the list of parties who could bring enforcement proceedings" and "threatens to undermine the State's ability to enter into future settlement agreements that seek to bring finality to the State and other litigants." Not so. This is not a suit to enforce the NMS. It is an action in mandamus to compel defendants to return to the National Mortgage Special Deposit Fund money plaintiffs claim was misappropriated in contravention of section 12531. As we have explained, there is a sharp duty to comply with restrictions placed on the expenditure of public funds and a weighty public need for enforcement of such restrictions. Providing plaintiffs with standing in this case does nothing to undermine California's ability to enter into settlement agreements.

# III

### *Proper Interpretation of Section 12531*

We now turn to defendants' contention the trial court misconstrued section 12531. The trial court concluded section 12531 was intended to effectuate the terms of the federal consent judgments, which required compliance with the instructions provided by former Attorney General Harris in Exhibit B-2 to the National Mortgage Settlement designating the permissible uses of the $410 million direct payment. Rejecting defendants' contention subdivision (e) of that section permitted the director of finance to use the National Mortgage Special Deposit Fund to offset General Fund expenditures regardless of whether such offsets were consistent with these instructions, the trial court reasoned such a reading of the statute would "raise serious doubts about the legality of the statute, not only as to whether the Legislature may override a federal judgment, but also whether the Legislature constitutionally may delegate to an agency the authority to decide how millions of dollars of state funds shall be spent with virtually no guidance or direction from the Legislature."

Defendants assert this interpretation of section 12531 runs "[c]ontrary to the plain meaning of the statute" and argues the plain meaning of subdivision (e) of that section "gives the Director of Finance discretion to 'allocate or otherwise use the funds' in the [National Mortgage Special Deposit Fund] 'to offset General Fund expenditures' in three fiscal years, '[n]otwithstanding any other law.' It places no restriction on the type of General Fund expenditures that the funds can be used to offset, let alone the kinds of restrictions that the trial court erroneously found in the [former] Attorney General's instructions." We agree with the trial court's interpretation of the section.

21

## A.

### *Applicable Principles of Statutory Construction*

"Pursuant to established principles, our first task in construing a statute is to ascertain the intent of the Legislature so as to effectuate the purpose of the law.  In determining such intent, a court must look first to the words of the statute themselves, giving to the language its usual, ordinary import and according significance, if possible, to every word, phrase and sentence in pursuance of the legislative purpose.  A construction making some words surplusage is to be avoided.  The words of the statute must be construed in context, keeping in mind the statutory purpose, and statutes or statutory sections relating to the same subject must be harmonized, both internally and with each other, to the extent possible.  [Citations.]  Where uncertainty exists consideration should be given to the consequences that will flow from a particular interpretation.  [Citation.]  Both the legislative history of the statute and the wider historical circumstances of its enactment may be considered in ascertaining the legislative intent.  [Citations.]  A statute should be construed whenever possible so as to preserve its constitutionality.  [Citations.]"  (*Dyna-Med, Inc. v. Fair Employment & Housing Com.* (1987) 43 Cal.3d 1379, 1386-1387.)

While "the interpretation of a statute is an exercise of the judicial power the Constitution assigns to the courts" (*Western Security Bank v. Superior Court* (1997) 15 Cal.4th 232, 244 (*Western Security*)), "if the courts have not yet finally and conclusively interpreted a statute and are in the process of doing so, a declaration of a later Legislature as to what an earlier Legislature intended is entitled to consideration.  [Citation.]  But even then, 'a legislative declaration of an existing statute's meaning' is but a factor for a court to consider and 'is neither binding nor conclusive in construing the statute.'  [Citations.]  This is because the 'Legislature has no authority to interpret a statute.  That is a judicial task.  The Legislature may define the meaning of statutory

language by a present legislative enactment which, subject to constitutional restraints, it may deem retroactive. But it has no legislative authority simply to say what it *did* mean.' [Citations.]" (*McClung v. Employment Development Dept.* (2004) 34 Cal.4th 467, 473; *Carter v. California Dept. of Veterans Affairs* (2006) 38 Cal.4th 914, 922 (*Carter*); see also *California Employment Stabilization Com. v. Payne* (1947) 31 Cal.2d 210, 213-214 [where a statute is ambiguous, "a subsequent expression of the Legislature, although not binding on the court, may properly be used in determining the effect of a prior act"].)

Because our construction of the meaning of section 12531, set forth in our original opinion, was pending review before our Supreme Court at the time the Legislature enacted SB 861, it cannot be considered a final and conclusive construction of the law. We must therefore "give the Legislature's views 'due consideration.' " (*Carter*, *supra*, 38 Cal.4th at p. 922.) How much consideration is "due" depends on the circumstances. (Compare *Carter*, *supra*, 38 Cal.4th 914 and *Western Security*, *supra*, 15 Cal.4th 232 with *Peralta Community College Dist. v. Fair Employment & Housing Com.* (1990) 52 Cal.3d 40, 52 ["declaration of a later Legislature is of little weight in determining the relevant intent of the Legislature that enacted the law"] and *Apple Inc. v. Superior Court* (2013) 56 Cal.4th 128, 145 [same].)

## B.

### *Analysis*

Having considered the views of our current Legislature, expressed in SB 861, we confirm our original conclusion section 12531 was intended to effectuate the terms of the National Mortgage Settlement. As previously stated, subdivision (a) of this section provides: "The Legislature finds and declares that California, represented by the California Attorney General, entered a national multistate settlement with the country's five largest loan servicers. This agreement, the National Mortgage Settlement stemmed

23

from successful resolution of federal court action (Consent Judgment, United States v. Bank of America (No. 1:12-cv-00361, Banzr. D.C. Apr. 4, 2012). The National Mortgage Settlement is broad ranging, with California's share of this settlement estimated to be up to eighteen billion dollars ($18,000,000,000). Of this amount, approximately four hundred ten million dollars ($410,000,000) will come directly to the state in costs, fees, and penalty payments." (§ 12531, subd. (a).) Then subdivision (b) creates the National Mortgage Special Deposit Fund, continuously appropriates all moneys in the fund, and directs the department of finance to allocate the money. (*Id*., subd. (b).) Subdivisions (c) and (d) direct where the settlement disbursement shall be deposited, 90 percent going into the National Mortgage Special Deposit Fund. (*Id*., subds. (c) & (d).) Subdivision (e) then provides: "Notwithstanding any other law, the Director of Finance may allocate or otherwise use the funds in the [National Mortgage Special] Deposit Fund to offset General Fund expenditures in the 2011-12, 2012-13, and 2013-14 fiscal years. The Department of Finance and the Controller's office shall recognize this fiscal alignment accordingly for the purpose of the state budget process and legal basis of accounting." (*Id*., subd. (e).)

Because subdivision (a) makes reference to the former Attorney General's successful negotiation of the National Mortgage Settlement, and subdivisions (b) through (d) effectuate California's receipt of the settlement proceeds as set forth in the former Attorney General's instructions, i.e., 10 percent to the Unfair Competition Law Fund and 90 percent into a special deposit fund (the National Mortgage Special Deposit Fund), and because the purpose of creating a special deposit fund is to house money that is "collected or received for specific purposes" (§ 16372), it is only reasonable to conclude the Legislature intended the specific purposes set forth in the former Attorney General's instructions are also the purposes for which the National Mortgage Special Deposit Fund money may be spent.

Nevertheless, defendants claim the Legislature intended to allow the director of finance to disregard the former Attorney General's instructions and use the money in the National Mortgage Special Deposit Fund to offset *any* General Fund expenditures. This supposed intent, they argue, may be found in the phrase "[n]otwithstanding any other law" in subdivision (e), before that subdivision directs the director of finance to "offset General Fund expenditures in the 2011-12, 2012-13, and 2013-14 fiscal years." (§ 12531, subd. (e).) We are not persuaded that this phrase was intended to untether the offsets from the purposes for which the money was received. Indeed, defendants' reading of the statute would effectively defeat the purpose of creating a special deposit fund to house the money. Moreover, the fact that the Legislature intended the National Mortgage Special Deposit Fund to be a special deposit fund with restrictions on the use of the money housed therein is also supported by subdivision (g), which allows for "cashflow loans to the General Fund as provided in Sections 16310 and 16381." (*Id.*, subd. (g).) Sections 16310 and 16381 allow for such loans *from special deposit funds* when the General Fund is or will be exhausted.

Our reading of the statute, and that of the trial court, is also bolstered by the legislative history. The Legislative Counsel's Digest for section 12531 states: "This bill would establish the [National Mortgage Special] Deposit Fund in the State Treasury as a continuously appropriated fund and would require certain direct payments made to the state under the National Mortgage Settlement to be deposited in the fund for allocation by the Director of Finance, as specified. This bill would further authorize the Director of Finance to allocate moneys from the fund to offset General Fund expenditures during the 2011-12, 2012-13, and 2013-14 fiscal years *for purposes consistent with the National Mortgage Settlement*." (Legis. Counsel's Dig., Sen. Bill No. 1006, (2011-2012 Reg. Sess.) Stats. 2012, ch. 32, § 12, italics added <http://www.leginfo.ca.gov/pub/11-12/bill/sen/sb_1001-

25

1050/sb_1006_bill_20120625_amended_asm_v98.html> [as of Mar. 26, 2019], archived at <https://perma.cc/6ZHW-P2GM>.) The former Attorney General's general instructions for use of the settlement money is part of the NMS.

We also agree with the trial court's conclusion that defendants' reading of the statute would "raise serious doubts about the legality of the statute, not only as to whether the Legislature may override a federal judgment, but also whether the Legislature constitutionally may delegate to an agency the authority to decide how millions of dollars of state funds shall be spent with virtually no guidance or direction from the Legislature." Defendants address the first of these concerns by arguing the Legislature has plenary power over appropriations that includes the authority to override an Attorney General's settlement agreement as long as doing so does not interfere with a party's vested rights (primarily relying on *Van de Kamp v. Gumbiner* (1990) 221 Cal.App.3d 1260 and *Mendly v. County of Los Angeles* (1994) 23 Cal.App.4th 1193), and even though the NMS has been incorporated into a federal judgment, such a judgment may not contravene an otherwise valid state law unless necessary to vindicate a federal right (primarily relying on *Washington v. Penwell* (9th Cir. 1983) 700 F.2d 570 and *Cleveland County Ass'n for Government by the People v. Cleveland County Bd. of Com'rs* (D.C. Cir. 1998) 142 F.3d 468). Addressing the nondelegation doctrine, defendants argue there was no unconstitutional delegation because subdivision (f) requires the department of finance to "submit an expenditure plan to the Joint Legislative Budget Committee detailing the proposed use of the moneys in the [National Mortgage Special] Deposit Fund." (§ 12531, subd. (f).)

We need not decide these potential constitutional issues because our reading of section 12531, supported by the language of the statute and its legislative history, avoids them entirely. "When faced with a statute reasonably susceptible of two or more interpretations, of which at least one raises constitutional questions, we should construe it

in a manner that avoids *any* doubt about its validity." (*Association for Retarded Citizens v. Department of Developmental Services* (1985) 38 Cal.3d 384, 394.)

Nor does the Legislature's 2018 amendment to section 12531 alter our conclusion this provision was intended to effectuate the terms of the National Mortgage Settlement, including the former Attorney General's instructions. In their supplemental briefing on the new enactment, defendants argue, "the intended effect of SB 861 was to clarify that the allocations of funds made by the Director of Finance were consistent with . . . section 12531" and "such a subsequent expression by the Legislature as to the intent of a prior statute is persuasive evidence regarding the meaning of that statute." In making this argument, defendants rely primarily on *Western Security*, *supra*, 15 Cal.4th 232, and *Carter*, *supra*, 38 Cal.4th 914. Such reliance is misplaced.

In *Western Security*, *supra*, 15 Cal.4th 232, our Supreme Court gave effect to a subsequent Legislature's clarification of existing law and reversed the Court of Appeal's contrary conclusion concerning the meaning of that law. That case involved the interaction of two legal doctrines, one precluding a deficiency judgment for any loan balance left unpaid after the lender's nonjudicial foreclosure under a power of sale in a deed of trust or mortgage on real property (Code Civ. Proc., § 580d, the antideficiency statute), and the other making a letter of credit issuer's obligation to pay a draw conforming to the letter's terms separate from any underlying contract between the issuer's customer and the letter's beneficiary (the independence principle). (*Id*. at p. 237.) After a nonjudicial foreclosure left a deficiency, the lender attempted to draw on standby letters of credit of which it was the beneficiary. The Court of Appeal held this would indirectly impose on the borrower, who would be required to reimburse the issuer for the lender's draw on the letter of credit, "the equivalent of a prohibited deficiency judgment." (*Id*. at pp. 237-238.) The Legislature immediately passed urgency legislation providing that "an otherwise conforming draw on a letter of credit does not contravene

27

the antideficiency laws." (*Id*. at p. 238.) Thereafter, our Supreme Court transferred the matter back to the Court of Appeal for reconsideration in light of the new legislation. That court confirmed its prior decision, concluding the new legislation amounted to a change in the law with only prospective application. (*Id*. at p. 242.)

Reversing the Court of Appeal's decision, our Supreme Court first explained the Legislature's subsequent enactment did not seek to change the law, but rather sought to construe and clarify the meaning of existing law. Such an amendment, the court explained, " ' "must be accepted as the legislative declaration of the meaning of the original act, where the amendment was adopted soon after the controversy arose as to the interpretation of the original act . . . ." [Citation.]' [Citation.]" (*Western Security*, *supra*, 15 Cal.4th at pp. 243-244.) However, such a legislative declaration "is neither binding nor conclusive in construing the statute. Ultimately, the interpretation of a statute is an exercise of the judicial power the Constitution assigns to the courts." (*Id*. at p. 244.) Thus, the Court of Appeal erred in concluding the amendment had no effect on the case. (*Id*. at p. 252.) That subsequent enactment was entitled to "due consideration," but ultimately, questions of statutory interpretation are subject to de novo review by the courts. (*Id*. at p. 244.) As our Supreme Court noted, "there is little logic and some incongruity in the notion that one Legislature may speak authoritatively on the intent of an earlier Legislature's enactment when a gulf of decades separates the two bodies." (*Ibid*.) Turning to the proper interpretation of the antideficiency statute, the court held: "A creditor that draws on a letter of credit does no more than call on all the security pledged for the debt. When it does so, it does not violate the prohibition of deficiency judgments." (*Id*. at p. 252.) Thus, the court gave effect to the statutory amendment, not because it was bound to do so, but because it concluded the Court of Appeal erred in interpreting the antideficiency law to begin with. (*Id*. at pp. 250-252.)

Similarly, in *Carter*, *supra*, 28 Cal.4th 914, our Supreme Court gave effect to a subsequent Legislature's clarification of existing law where that existing law was ambiguous as to its proper scope and the clarification "was made promptly in response to [two Court of Appeal opinions], in order to clarify the ambiguities that caused confusion in the appellate courts and among litigants." (*Id*. at p. 930.)

Here, as set forth in detail above, SB 861 added subdivision (h) to section 12531, confirming and ratifying the director of finance's allocations of funds from the National Mortgage Special Deposit Fund as having been "consistent with the direction given to the Director of Finance in subdivision (e) to offset General Fund expenditures . . . ." (§ 12531, subd. (h).) This amendment may well alleviate the potential unconstitutional delegation problem. (See, e.g., *California Chamber of Commerce v. State Air Resources Bd.* (2017) 10 Cal.App.5th 604, 632 [even if the Board lacked authority to adopt the regulations at issue, the Legislature subsequently ratified them]; see also *Professional Engineers in California Government v. Schwarzenegger* (2010) 50 Cal.4th 989, 1000, 1046-1048 [even if the Governor lacked authority to unilaterally institute a furlough program, the Legislature subsequently ratified the program].) But it does not alter our interpretation of section 12531. Indeed, in uncodified section 2 of SB 861, the Legislature "declares that the allocations . . . were made for purposes consistent with the National Mortgage Settlement." (Stats. 2018, ch. 331, § 2, subd. (a).) This declaration, while at odds with the conclusion we reach immediately below, is a tacit admission that the allocations were required to be consistent with that settlement agreement. Moreover, as we explain below, the fact that the Legislature believes the director of finance's allocations were consistent with section 12531 and the NMS "is not binding on a court. [Citation.] . . . The interpretation of a statute or a [settlement agreement] ' "is an exercise of the judicial power the Constitution assigns to the courts." [Citation.]' [Citations.]" (*California School Boards Assn. v. State* (2011) 192 Cal.App.4th 770, 788.)

29

## IV

### *Consistency with the National Mortgage Settlement*

We now turn to the question of whether the offsets carried out by the director of finance are consistent with the National Mortgage Settlement. As mentioned, the trial court concluded over $331 million was unlawfully diverted from the National Mortgage Special Deposit Fund for purposes inconsistent with the NMS, specifically the former Attorney General's general instructions set forth in Exhibit B-2 thereto. Defendants argue these expenditures were consistent with both the purposes of the direct payment set forth in Exhibit B to the NMS and the former Attorney General's instructions. In their appeal, plaintiffs contend the amount unlawfully diverted from the National Mortgage Special Deposit Fund was actually $350 million. We again agree with the trial court's assessment.

As a preliminary matter, we reject defendants' assertion that consistency with the purposes set forth in Exhibit B would suffice to authorize the expenditures even if those expenditures were contrary to the former Attorney General's instructions. The NMS provided that the direct payment amount "shall be distributed in the manner and for the purposes specified in Exhibit B." Paragraph 1 of Exhibit B provides that "[e]ach State Attorney General shall designate the uses of the funds" and then states: "To the extent practicable, such funds shall be used for purposes intended to avoid preventable foreclosures, to ameliorate the effects of the foreclosure crisis, to enhance law enforcement efforts to prevent and prosecute financial fraud, or unfair or deceptive acts or practices and to compensate the States for costs resulting from the alleged unlawful conduct of [the Bank defendants]. Such permissible purposes for allocation of the funds include, but are not limited to, supplementing the amounts paid to state homeowners under the Borrower Payment Fund, funding for housing counselors, state and local foreclosure assistance hotlines, state and local foreclosure mediation programs, legal

assistance, housing remediation and anti-blight projects, funding for training and staffing of financial fraud or consumer protection enforcement efforts, and civil penalties. *Accordingly, each Attorney General has set forth general instructions for the funds in the attached Exhibit B-2*." (Italics added.) Thus, while Exhibit B provides general permissible purposes for use of the direct payment, it expressly incorporates the more specific instructions provided by the former Attorney General in Exhibit B-2. Because, as we have concluded, section 12531 was intended to effectuate the NMS, the offsets made by the director of finance must be consistent with the former Attorney General's instructions.

These instructions provide: "The remainder [i.e., 90 percent of the direct payment] shall be paid and deposited into a Special Deposit Fund created for the following purposes: for the administration of the terms of this Consent Judgment; monitoring compliance with the terms of this Consent Judgment and enforcing the terms of this Consent Judgment; assisting in the implementation of the relief programs and servicing standards as described in this Consent Judgment; supporting the Attorney General's continuing investigation into misconduct in the origination, servicing, and securitization of residential mortgage loans; to fund consumer fraud education, investigations, enforcement operations, litigation, public protection and/or local consumer aid; to provide borrower relief; to fund grant programs to assist housing counselors or other legal aid agencies that represent homeowners, former homeowners, or renters in housing-related matters; to fund other matters, including grant programs, for the benefit of California homeowners affected by the mortgage/foreclosure crisis; or to engage and pay for third parties to develop or administer any of the programs or efforts described above."

Relying on our decision in *Shaw*, *supra*, 175 Cal.App.4th 577, the trial court concluded these instructions "do not allow use of the funds to reimburse the General

31

Fund for past expenditures." We agree. In *Shaw*, a taxpayer challenged the legality of the Legislature's transfer of $622 million of spillover gas tax revenue, that would have otherwise gone into a public transportation account (PTA) under Proposition 116, into a newly-created mass transportation fund (MTF), and subsequent appropriation of that $622 million and another $637 million directly from the PTA for a number of purposes, including a $200 million payment from the MTF for past debt on mass transportation bonds and a $409 million transfer from the PTA to the General Fund to offset the cost of past debt service payments on such bonds. (*Id*. at pp. 593-594.) The trial court invalidated the latter transfer because Proposition 116 restricted appropriation of money in the PTA to "transportation planning or mass transportation purpose[s]" and the trial court concluded offsetting the General Fund for past debt service payments on mass transportation bonds did not comport with these purposes. (*Id*. at p. 594.)

We agreed with this determination, explaining: "There is a clear distinction between transferring revenue from the PTA to the General Fund to pay *current* debt obligations on mass transportation bonds and transferring such revenue to reimburse for *past* debt obligations. In the case of the former, the revenue flows from the source to the present obligation via the General Fund to serve a mass transportation purpose. Although the money passes through the General Fund, it is still actually being used for the identified mass transportation purpose. In the Legislature's discretion, this may include the payment of current bond debt on mass transportation bonds. In the case of offsets or reimbursement of past debt service payments, however, there is no mass transportation debt obligation to be paid with the PTA funds. The debt was paid by the General Fund in the prior fiscal years. No actual debt remains. Money from the PTA under the label of offsetting or reimbursing past debt payments is simply transferred to the General Fund where it can be used for any governmental purpose. Such reimbursement of the General Fund for its previous payment of its obligation on the specified bonds does not serve a

32

'mass transportation' purpose. There is no flow through similar to the payment of current debt." (*Shaw*, *supra*, 175 Cal.App.4th at p. 610.) We also invalidated the $200 million transfer from the MTF. Having concluded earlier in the opinion that the transfer of $622 million of spillover gas tax revenue from the PTA to the MTF was invalid (*id*. at p. 602), this $200 million transfer from the MTF was also saddled with the " 'mass transportation' purpose" requirement and payment of past debt did not satisfy that requirement. (*Id*. at pp. 609-610.)

Applying this reasoning, the trial court in this case invalidated all transfers to the General Fund to offset debt service payments for housing bonds (totaling $292.7 million). The trial court also invalidated transfers made to the General Fund during the 2012-13 and 2013-14 fiscal years to offset DOJ and DFEH expenditures for the 2011-12 and 2012-13 fiscal years, (totaling $38.4 million), as those expenditures had also already been paid by the General Fund. We agree with this assessment.

Nevertheless, defendants argue the fact that "the Legislature knew and understood how the Director of Finance intended to use the money" and did not "object is strong evidence that the plan complied with the Legislature's intent in enacting section 12531." This argument is bolstered by SB 861, as we have explained above. However, we still are not persuaded. While this is evidence the Legislature may have *believed* the director of finance's proposed offsets were consistent with section 12531 and the NMS, confirmed by the current Legislature's declared belief "that the allocations . . . were made for purposes consistent with the National Mortgage Settlement" (Stats. 2018, ch. 331, § 2, subd. (a)), we reiterate that such a "belief is not binding on a court. . . . The interpretation of a statute or a [settlement agreement] ' "is an exercise of the judicial power the Constitution assigns to the courts." [Citation.]' [Citations.]" (*California School Boards Assn. v. State*, *supra*, 192 Cal.App.4th at p. 788.)

The remaining $19.5 million was transferred from the National Mortgage Special Deposit Fund to the General Fund during the 2013-14 fiscal year to pay certain DOJ and DFEH expenditures incurred that year. The trial court declined to invalidate these transfers concluding there was no evidence the obligations were already paid at the time of the transfers. In their appeal, plaintiffs claim these payments should also have been invalidated, arguing these offsets "rest upon an accounting fiction" and the fact that DOJ and DFEH "might have something to do with administering programs or enforcing regulations related to the purposes for which the [National Mortgage Special Deposit] Fund was created is not sufficient" to comply with the former Attorney General's instructions. However, while DOJ and DFEH do more than investigate mortgage fraud and housing-related matters, respectively, the burden was on plaintiffs to show these specific expenditures went to other purposes. We agree with the trial court's conclusion they failed to carry that burden.

## V

### *Appropriate Remedy*

Finally, we address the question of the appropriate remedy. The trial court concluded principles of separation of powers prevented it from issuing a writ of mandate directing the Legislature to appropriate funds to restore the $331 million unlawfully diverted from the National Mortgage Special Deposit Fund. Instead, the trial court declared an obligation to restore the unlawfully diverted funds and ordered such restoration "as soon as there is a sufficient appropriation 'reasonably' and 'generally' available for such purpose."

Plaintiffs do not dispute that directing an appropriation would violate the separation of powers. Instead, they argue: "The legal violations at issue in this case lie not in a failure to *appropriate* the requisite funds, but in a series of executive orders, issued by the Defendant Director of Finance to the Defendant Controller, that unlawfully

34

*transferred* the funds that had already been appropriated. Accordingly, the appropriate remedial order would simply direct Defendants to rescind those transfers—or, equivalently, to transfer equal sums back from the General Fund to the [National Mortgage Special] Deposit Fund." We agree.

"Article III, section 3 of the California Constitution provides that '[t]he powers of state government are legislative, executive, and judicial. Persons charged with the exercise of one power may not exercise either of the others except as permitted by this Constitution.' Article XVI, section 7 provides that '[m]oney may be drawn from the Treasury only through an appropriation made by law and upon a Controller's duly drawn warrant.' Article IV, sections 10 and 12 set forth the respective powers of the Legislature and Governor over the enactment of appropriations. It has long been clear that these separation-of-powers principles limit judicial authority over appropriations. [Citations.]" (*Butt v. State of California* (1992) 4 Cal.4th 668, 698 (*Butt*).)

For example, in *Butt*, *supra*, 4 Cal.4th 668, relied upon by the trial court in declining to issue the writ sought by plaintiffs, after a school district announced it lacked funds to complete the final six weeks of the school year, the trial court issued a preliminary injunction directing the State of California (State), the Controller, and the superintendent of public instruction to ensure the school district's students would receive the full school term, approved a plan for the State to take over the school district's operations, and further approved an emergency loan of funds from other appropriations. Affirming the trial court's determination that "the State has a constitutional duty . . . to prevent the budgetary problems of a particular school district from depriving its students of 'basic' educational equality," and that the trial court did not err in concluding fulfillment of this duty "demanded immediate State intervention," our Supreme Court concluded the trial court lacked the authority to approve the "diversion of emergency

35

loan funds from appropriations clearly intended by the Legislature for other purposes." (*Id.* at pp. 673-674.)

In reaching the latter conclusion, the court distinguished *Mandel v. Myers* (1981) 29 Cal.3d 531 (*Mandel*), describing that case as "the only decision by this court which found judicial power to 'commandeer' appropriated funds." (*Butt*, *supra*, 4 Cal.4th at p. 698.) In *Mandel*, the trial court ordered the Controller to pay attorney fees awarded to a department of health services (DHS) employee out of funds appropriated for the operating expenses of DHS, the principal defendant in the underlying action. Our Supreme Court held the trial court's order did not violate separation of powers principles despite the fact that a legislative committee deleted a line-item appropriation for this particular fee award. The court reasoned that the language of the appropriation for the operating expenses of DHS was "clearly broad enough to encompass court-awarded attorney fees" (*id.* at p. 543) and the Legislature's attempt to exclude this particular fee award was an invalid attempt to "disregard the finality of a court judgment and take it upon itself to readjudicate on a case-by-case basis the merits of such a judgment." (*Id.* at pp. 546-547.) Thus, because the restriction on the use of appropriated funds for payment of the fee award in question was invalid, the funds remained available for payment of the award. (*Id.* at p. 550.)

Returning to *Butt*, *supra*, 4 Cal.4th 668, our Supreme Court explained the *Mandel* decision does not "permit court-ordered diversion of an appropriation away from a clear, narrow, and valid purpose specified by the Legislature." (*Butt, supra,* at p. 700.) Thus, the court concluded the trial court erred when it authorized an emergency loan of money from two appropriations that were "earmarked for purposes entirely distinct from the subject matter of this lawsuit. They were not reasonably available for court diversion to finance the remainder of the [school district's] school term." (*Id.* at pp. 701-702.)

36

The trial court's reliance on *Butt, supra,* 4 Cal.4th 668 was misplaced because plaintiffs herein are not seeking to "commandeer" money the Legislature appropriated for purposes other than those set forth in the NMS. Rather, the Legislature continuously appropriated the money in the National Mortgage Special Deposit Fund for those very purposes and authorized the director of finance to transfer the money to the General Fund to offset expenditures comporting with those purposes. While, as defendants argue, the Legislature may have believed the director of finance's proposed offsets complied with the purposes for which the National Mortgage Special Deposit Fund was created, it is the judicial branch that has the constitutional authority to interpret statutes. (*California School Boards Assn. v. State*, *supra*, 192 Cal.App.4th at p. 788.) We have determined, as did the trial court, the challenged offsets reimbursing the General Fund for past obligations did not comport with these purposes. Accordingly, this is not a case in which the trial court would have been required to order money appropriated for one purpose to be used for another purpose. Instead, it was asked to order money used for a purpose *contrary to the appropriation* returned to the special fund from which it was unlawfully diverted.

For these reasons, our case is more analogous to *Daugherty*, *supra*, 1 Cal.2d 298. There, two appropriations were made from the corporation commission fund, "a special fund in the nature of a trust fund," which the Legislature "permanently set apart" from the General Fund for the use and benefit of the division of corporations to make that department self-supporting. (*Id*. at pp. 307-308.) Our Supreme Court concluded the first appropriation (i.e., a capital expenditure for the enlargement of a state office building to house the San Francisco offices of the commissioner of corporations with rent to be collected by the division of corporations for office space in excess of the department's requirements) could be deemed to have been for the benefit of the department. (*Id*. at p. 307.) The second appropriation (i.e., a capital expenditure for the completion of a state

37

office building "without restriction as to office space for housing the corporation commissioner's department or the collection of rent[] for the benefit of that department") could not be deemed to have been for the benefit of the department and was "chargeable only against the general fund or some other tax or general revenue fund." (*Id*. at pp. 307-308.) The court did not "deny power upon the part of the Legislature to transfer a special fund reserve temporarily from one purpose to another . . . [b]ut when these diversions are made the transfers are . . . deemed a loan from the special fund to be returned to that fund as soon as funds are available." (*Id*. at p. 309.) However, the second appropriation "did not purport to make the transfer as a loan, but it boldly took from the special fund the money necessary for the support and maintenance of the corporation commissioner's department with no provision for its repayment . . . ." (*Id*. at p. 310.) The court held, "provid[ing] fees for regulatory purposes . . . and then devot[ing] the money so received to capital expenditures for a foreign purpose" violated the special law provision of the California Constitution. (*Ibid*.) Important to our discussion of the appropriate remedy, the court concluded the unlawfully diverted money was "in law still in the corporation commission fund" and issued a writ of mandate ordering the Controller to "retransfer from the general funds of the state to the corporation commission fund" the amount that was unlawfully diverted. (*Id*. at p. 312.)

Here, too, money was unlawfully diverted from a special fund in contravention of the purposes for which that special fund was established. Of course, *Daugherty, supra,* 1 Cal.2nd 298 involved an unconstitutional diversion *by the Legislature*, whereas this case involves an unlawful diversion by the director of finance in contravention of section 12531 and the National Mortgage Settlement, but this difference makes for a more compelling case for ordering the money returned, not less. Moreover, in their supplemental briefing following the Legislature's enactment of SB 861, defendants argue the Legislature ratified the director of finance's expenditures. Without deciding

38

the issue, we simply note this argument places this case squarely in line with *Daugherty*. The trial court should have issued a writ of mandate ordering the retransfer of the wrongfully diverted funds from the General Fund to the National Mortgage Special Deposit Fund.

## DISPOSITION

The portion of the judgment declining to issue the requested writ of mandate is reversed and the matter is remanded to the trial court with directions to issue a writ of mandate directing defendants, Gavin C. Newsom, Governor (successor to Edmund G. Brown, Jr.), Keely Bosler, Finance Director, and Betty Yee, Controller, to retransfer from the General Fund to the National Mortgage Settlement Deposit Fund the sum of $331,044,084.  Plaintiffs, National Asian American Coalition, COR Community Development Corporation, and National Hispanic Christian Leadership Conference, are awarded costs on appeal.  (Cal. Rules of Court, rule 8.278(a)(1).)


            /s/
        HOCH, J.


We concur:


        /s/
RAYE, P. J.


        /s/
HULL, J.